## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| United States of America | ) |
| | )     No. 18 CR 522 |
| v. | ) |
| | )     Judge John Robert Blakey |
| Xavier Travis | ) |

### DEFENDANT XAVIER TRAVIS'S SENTENCING MEMORANDUM

Mr. Travis stands before this Court after pleading guilty to the possession of three firearms provided by undercover agents and doing so with a felony conviction in his own background. He accepts responsibility for his actions and he knows that the punishment will involve incarceration. He asks, however, that the Court balance the need for punishment with his individual history and characteristics, and the particular circumstances of this unusual case. Mr. Travis, by the Federal Defender Program and its attorney, Amanda G. Penabad, respectfully requests that the Court impose a sentence of **54 months' imprisonment, to be followed by three years of supervised release**. Such a sentence is sufficient, but not greater than necessary to fulfill the statutory sentencing objectives found in 18 U.S.C. § 3553(a) and as explained by the Supreme Court in *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007).

1

FACTUAL BACKGROUND

Mr. Travis does not deny that he possessed firearms in violation of the law and that such a firearm offense is a serious charge. But, as in most cases that are the result of ATF reverse sting operations, Mr. Travis believes that the context of the offense is relevant to informing the Court's understanding of his conduct and the appropriate punishment.

In the summer of 2018, the ATF, through a confidential informant, learned that Mr. Travis had access to small quantities of drugs. The agents approached Mr. Travis about buying a gram or two of drugs on a handful of occasions, and eventually about trading other items for drugs, such as electronics and car parts. In August 2018, the agents proposed trading Mr. Travis a flat screen television for drugs. PSR ¶12. Shortly after, the agents told Mr. Travis that they had access to other valuable items, including firearms. Prior to the undercover agent's statement that he had access to guns, Mr. Travis never mentioned a desire to purchase weapons, or a need for a gun. Over the course of the month, the agents repeatedly reached out to Mr. Travis to try to conduct a transaction of drugs for guns. On August 27, 2018, Mr. Travis agreed to meet with agents to trade drugs for firearms, and was arrested when he took possession of the weapons at the ATF warehouse.

The government and Probation Office advocate for a mechanical application of the guidelines in this case, including enhancements for the alleged nature of one of the firearms in question. But the unusual facts of this case, particularly the reverse-sting nature of the operation, call for a closer examination of the facts to determine

2

the appropriate measure of punishment. When, as here, law enforcement plays an active role in shaping the contours of the crime, and thus the potential punishment, the Court should closely scrutinize the defendant's actions to determine a true measure of culpability and the sentence that is sufficient, but not greater than necessary.

As detailed further below, the video and audio recordings made in the course of this sting operation demonstrate that Mr. Travis not the hardened, dangerous criminal that the government seeks to present him as. A number of his actions and statements demonstrate that, although Mr. Travis did agree to trade for firearms, he did not seek out, nor did he have access to, the kind of gun that the ATF offered him. Nor is there evidence that Mr. Travis had any knowledge of the character of that firearm. The evidence shows that when the agents presented Mr. Travis with the MP-5, Mr. Travis had no familiarity with the weapon. Upon seeing the gun for the first time, Mr. Travis had to ask the agents what it was. *See* Agent Bodycamera, Aug 15, 2018 at 16:36:52.[1] When they offered him a fully automatic version of the weapon, Mr. Travis declined. *Id*. at 16:39:15. When he was offered silencers and an extended magazine, Mr. Travis told the agents that he was "not big on 30-shot clips." *Id*. at 16:42:10. And when asked what he would do with the weapon, Mr. Travis told the agents that he "didn't have a need for guns" but kept them "for a rainy day," because "you don't come across shit like this all the time." *Id*. The agents played up the rare nature of the weapon, telling Mr. Travis that they had a connection on a military base

---

[1] The defense plans to provide the excerpts cited herein at the sentencing hearing.

to obtain the firearm, which was not generally commercially available. In short, the agents both presented Mr. Travis with the opportunity to buy a weapon that he otherwise never would have had access to and misled him regarding the nature of that firearm. The government now seeks to rely on the characteristics of that weapon to significantly enhance Mr. Travis's ultimate sentence.

Mr. Travis does not argue that he is not responsible for his actions or that he did not agree to purchase the firearms. He understands that he made the choice to accept the deal and must accept the consequences of his actions. But he asks the Court to consider the context of the offense and the fact that he did not have knowledge of the properties of the firearm at issue, nor did he seek it out, nor could he have accessed such a firearm but for the intervention of the ATF agents, in its consideration of sentence. The guidelines presented by the government represent an inequitable application of sentencing principles, and a sentence that is greater than necessary given the particular facts and circumstances of Mr. Travis's case. For the reasons that follow, Mr. Travis submits that a sentence of 54 months is appropriate under the §3553(a) factors.

<div align="center">DISCUSSION</div>

## I.    THE ADVISORY GUIDELINES AND PSR; 18 U.S.C. § 3553(a)(4)

The Supreme Court has instructed sentencing courts to begin by properly calculating the advisory guideline range. *See Gall*, 552 U.S. at 49. In this case, the Probation Office calculated a total offense level of 23. Combined with Mr. Travis's criminal history category of V, it is the Probation Office's position that the advisory

guidelines range is 84 to 105 months' incarceration. Mr. Travis objects to this calculation.

### A. The Base Offense Level

The Presentence Report and the government's version each assert that the appropriate base offense level is 20, although for different reasons. Mr. Travis disagrees with both parties. He argues that the government has failed to meet its burden to substantiate the base offense level, and that even if the Court finds otherwise, the Section 3553(a) factors counsel a sentence in line with a reduced base offense level. Mr. Travis submits that the proper base offense level is 14, pursuant to §2K2.1(a)(6), because Mr. Travis was a prohibited person at the time of the offense.

### 1. The Government's Version Regarding Base Offense Level.

According to the government's version, the base offense level is 20 pursuant to §2K2.1(a)(4)(B), because (1) Mr. Travis was a prohibited person at the time of the offense and (2) the offense included a firearm capable of accepting a high-capacity magazine. *See* Government Version at 7, attached to PSR; PSR ¶13. While the MP-5 involved in the offense is theoretically *capable* of accepting a high-capacity magazine, the Guidelines require more in order for this base offense level to be properly applied.

Application Note 2 to Section 2K2.1 makes it clear that the enhanced base offense level should only apply where "A) the firearm *had attached* to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was *in close proximity* to the firearm." (Emphasis added.) As noted in the PSR, the case

agent did not provide any such information documenting the presence of a high-capacity magazine prior to the finalization of the PSR. PSR ¶14. Nor was any such allegation included in the supplement issued on January 13, 2020. *See* Supplemental Report, Dkt # 76. None of the ATF reports regarding Mr. Travis's arrest, nor the gun and trace reports provided in discovery document any high-capacity ammunition. Nor is a high-capacity magazine visible on any of the surveillance or body camera footage. To date, the government has not provided the Court with any evidence that the firearm in question had attached or in close proximity to it a magazine that held more than 15 rounds.

Additionally, the discovery shows that in a conversation nearly two weeks before Mr. Travis's arrest, Mr. Travis explicitly stated that he was not interested in such high-capacity magazines. The agents proposed accessories to Mr. Travis, including silencers. Mr. Travis told that agents that he did not use 30-round magazines. *See* Video, Aug. 15, 2018 at 16:42:10 ("I'm really not big on like 30-shot clips"). Consequently, the base offense level of 20 should not be applied, as the criteria has not been met.

2. **The PSR Position Regarding Base Offense Level**.

According to the presentence report, the case agent relayed to the Probation Office a new basis for asserting the base offense level of 20. *See* PSR ¶14. According to the agent, and by adoption, the Probation Office, the base offense level should be 20 pursuant to §2K2.1(a)(4)(B), because (1) Mr. Travis was a prohibited person at the time of the offense and (2) one of the firearms in question is a firearm described in 26

U.S.C. §5845(a). PSR ¶14. Mr. Travis submits that the firearm does not qualify as a gun described in 26 U.S.C. §5845(a).

Probation's determination that the firearm falls within 26 U.S.C. §5845(a) is based on an ATF report provided by the government. In that report, the agent asserts that the MP-5 handled by Mr. Travis in this case falls within the definition of a "firearm" in 26 U.S.C. §5845(a).[2] Section 5845(a) defines a firearm as:

> "(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; (5) any other weapon, as defined in subsection (e); (6) **a machinegun;** (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device.

26 U.S.C. § 5845 (emphasis added). The ATF, and by adoption, the Probation Office, assert that the MP-5 qualifies as a machinegun, and therefore falls within the ambit of 26 U.S.C. § 5845(a). Mr. Travis denies that the MP-5 is properly classified under the guidelines as a machinegun.

Under the National Firearms Act ("NFA"), a machinegun is defined as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

---

[2] The word "firearm" as defined in the National Firearms Act, 26 U.S.C.A. §§ 5801 et seq., is much narrower than the colloquial use of the term.

26 U.S.C. § 5845(b). In the ATF report in question, the examiner concludes that the MP-5 that the ATF gave to Mr. Travis falls within this definition.

The agent does not contend that the MP-5 that Mr. Travis handled was capable of shooting automatically, designed to shoot automatically, or readily restored to shoot automatically. Rather, the agent contends that the firearm had the "frame or receiver" of an automatic weapon and therefore qualifies under the statute.[3] Essentially, the agent asserts that, even though the weapon as handled by Mr. Travis was unquestionably *not* capable of firing automatically at the time he possessed it, because the stock of the weapon could theoretically be manipulated into a machinegun with the addition of extra parts, it should therefore be counted as an automatic firearm under the statute.

In the report, the examiner acknowledges that the MP-5 gun Mr. Travis handled had a two-position, semiautomatic trigger group installed, with options of "safe" or "semi-automatic" fire only, and therefore does not and cannot fire automatically. Nevertheless, in the course of his examination, the agent proceeded to seek out a different machinegun trigger group from the ATF National Firearms Collection and install it on the MP-5. With that new trigger group installed, the

---

[3] The frame or receiver is "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 479.11. More colloquially, "[a] receiver is similar to the chassis of a car. It houses the operational parts that make a gun fire, much like a chassis houses the engine, transmission and other mechanisms necessary to make an automobile operate. The parts typically housed by a receiver are the gun's firing mechanisms—hammer, bolt, trigger, sear, and firing pins." *U.S. v. 1,100 Machine Gun Receivers*, 73 F. Supp. 2d 1289, 1291 (D. Utah 1999), *judgment aff'd*, 9 Fed. Appx. 815 (10th Cir. 2001).

examiner selected the newly-available "automatic" position and fired the weapon automatically. As a result, he declared the MP-5 to be a machinegun.

In this case, the Court should find that the application of the machinegun base offense level is inappropriate for a number of reasons. First, the Supreme Court has repeatedly held that in all cases prosecuted under the NFA, the government must prove that the defendant knew the features of the firearm that brought it within the scope of the Act. Second, analogous guideline provisions demonstrate that the Commission only intended the enhanced base offense levels to apply where the firearm was *actually* equipped with more dangerous features, and the firearm in question was not capable of automatic fire at the time of the offense. Third, the agents explicitly told Mr. Travis that the firearm in question was a semi-automatic weapon and not a fully-automatic weapon, and punishing the offense as a machinegun would be wholly inequitable. No deterrent purpose is served by punishing the offense as a machinegun, as Mr. Travis was not aware of the character of the weapon or potential for conversion, and so could not have corrected his conduct in deference to the law.

a.      *Knowledge of the Character of the Weapon is Required to Apply the Enhancement.*

The Court should still decline to apply the enhanced base offense level because there is no evidence that Mr. Travis knew the weapon to be capable of adaptation to a fully automatic weapon. The government's construction of the guidelines suggests that any semiautomatic weapon with a machinegun's frame would trigger the enhanced base offense level, regardless of whether the individual had knowledge of the potential to convert their weapon to an automatic weapon, or the intention to do

so. But the Supreme Court has definitively ruled that an individual have knowledge of the machinegun character of the weapon to trigger liability. In *Staples v. United States*, the defendant possessed a semi-automatic weapon that had been modified into a machinegun by filing away a metal stop inside the receiver. 511 U.S. 600, 603, 114 S. Ct. 1793, 1796 (1994). The defendant claimed ignorance of the weapon's automatic capability, and the Supreme Court considered whether the government was required to prove knowledge of the firearm's proven automatic capability to sustain the conviction for the offense of unlawful possession of an unregistered machinegun, 26 U.S.C. §5861(d). The Court rejected the government's position that knowledge of the automatic nature of the firearm was not required, and held that the statute should not be read to criminalize unknowing possession of an automatic weapon. This Court should likewise apply this requirement of knowledge of the character of the weapon to the application of the Guidelines here.

Nothing in the record establishes that Mr. Travis knew the weapon could be converted into a machinegun. In fact, the discovery in this case demonstrates that when the agents showed Mr. Travis the MP-5, his reaction was to ask "what the [] is this?" Agent Bodycamera, Aug 15, 2018 at 16:36:52. The agent asked whether Mr. Travis had ever seen an MP-5 and told him that the gun was a "nine," joking to Mr. Travis that it felt like a BB gun to shoot. The agent never indicated that the weapon was a machinegun. Instead, the agent explicitly told Mr. Travis that the weapon was not fully automatic, but rather semi-automatic. *See* Agent Bodycamera, Aug 15, 2018 at 16:39:00 ("One like that, that's semi-automatic, every time you pull the trigger?").

There is absolutely no evidence that Mr. Travis had any knowledge of the nature of the firearm; instead, the evidence affirmatively shows that Mr. Travis believed the weapon to be a semi-automatic firearm.

Additionally, there is no evidence Mr. Travis knew the gun could be modified into a machinegun. There was no machinegun trigger group installed on the MP-5 when the ATF agents handed the gun to Mr. Travis. There was no machinegun trigger group in the tool box containing the guns. There is no evidence that there was a machinegun trigger group anywhere in the warehouse where the exchange was made. There is no evidence Mr. Travis possessed such a trigger group at his residence or any location. Mr. Travis never suggested he had an interest in, access to, or intent to find a machinegun trigger group. There was no discussion with the agents about the potential to modify the weapon. Without any evidence suggesting that Mr. Travis knew of the potentially convertible nature of the weapon, the application of the enhanced base offense level is inappropriate.

     b.    *The Application Notes to the Firearm Guidelines Indicate that Enhancements are Appropriate Only When a Conversion is Actually Performed or Can Imminently be Performed.*

The firearm guidelines assign base offense levels based on the nature of the weapon itself and the individual's background, with more dangerous weapons and more serious criminal histories punished more severely. It is apparent that the guidelines seek to punish machineguns more severely because they have the ability to shoot more rounds more quickly, and are therefore more dangerous. But in this case, it is uncontested that the weapon Mr. Travis handled could not fire

automatically in the brief moments when he possessed it. The triggergroup on the weapon only had options for the safe position and semi-automatic fire. On the date of his arrest, there was a zero-percent probability that Mr. Travis could shoot the weapon in fully-automatic mode. It therefore makes absolutely no sense to punish Mr. Travis as though he had possession of a more dangerous weapon. By any practical measure, the weapon he briefly held was not more dangerous than any other semi-automatic weapon, which does not qualify as a "firearm" under 26 U.S.C. §5845(a).

Additionally, the Court should also decline to apply the enhanced base offense level on the grounds that there is no evidence that Mr. Travis could have readily converted the weapon to a machinegun. The only way the MP-5 in question could have fired automatically was if the possessor had access to a military-grade triggergroup and the knowledge and skill to perform the modification. There is no allegation that Mr. Travis had either.

Other portions of 2K2.1 demonstrate that the Guidelines are not focused on punishing the theoretical dangerousness of a weapon, but the actual, practical dangerousness. As is relevant here, subsections 2K2.1(a)(1), 2K2.1(a)(3), and 2K2.1(a)(4)(B) increase the base offense level for a gun "capable of accepting a large capacity magazine." As noted above, although the plain language of the guideline seems to indicate that only the *theoretical* possibility of accepting a high capacity magazine is required to trigger the higher base offense level, the application notes make it clear that it is the *actual* conduct, not the theoretical conduct, which is punished. Application Note 2 states that the base offense level should only apply

where "A) the firearm *had attached* to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was *in close proximity* to the firearm." (Emphasis added.) Therefore, only when the possessor attached or imminently could have attached an extended magazine is the conduct held to be more severe, and therefore punished more severely. The Court should apply this same logic to the concept of a machinegun. Only when there is evidence that an individual took steps to modify the weapon to fire automatically should the enhanced base offense level related to a machinegun apply.

Applying the enhanced base offense level of 20 on the basis that the weapon was a machinegun, as the government suggest, would be a perversion of the goals of the guidelines.

      c.    *Even if the Court Determines the Enhanced Base Offense Level May Properly be Applied under the Guidelines, the Court Should Use its Discretion to Sentence Mr. Travis as if the Weapon Was Not a Machinegun, Given the Agents' Explicitly Misleading Representations.*

In the context of this case, applying the higher base level applicable to a machinegun would essentially be condoning the affirmative efforts of the ATF agents to mislead Mr. Travis. It was the agents who determined what kind of guns to present to Mr. Travis; at no point did Mr. Travis ask the agents for a machinegun. In fact, the agents offered the choice of a fully or semi-automatic MP-5 to Mr. Travis. The agent specifically told Mr. Travis that the MP-5 he was showing Mr. Travis was a semi-automatic weapon, *not* a fully-automatic weapon. *See* Agent Bodycamera, Aug 15,

2018 at 16:39:00 ("One like that, that's *not full auto*, it's, you know, s*emi every time you pull the trigger*?"). The agent offered Mr. Travis the choice between the fully- and semi-automatic versions, and Mr. Travis declined the fully automatic version, explicitly electing the semi-automatic version of the MP-5. *See* Agent Bodycamera, August 15 2018, at 16:39:15. It bears repeating that the agents *explicitly* told Mr. Travis that the weapon was semi-automatic, not fully automatic.

Further, there is no evidence that Mr. Travis had any knowledge that the semi-automatic MP-5 could be converted to a machinegun by applying a new triggergroup, nor did agents advertise that information to him. As noted above, Mr. Travis had no familiarity with the weapon when the agents showed it to him, asking "what the [] is this?" *See* Agent Bodycamera, August 15 2018, at 16:36:52. Mr. Travis had every reason to believe that the gun provided by the agents was *not* a machinegun based on their representations to him. Indeed, not only did Mr. Travis lack knowledge that the MP-5 could be considered a machinegun, but the agents made representations to Mr. Travis that led him to believe the gun he possessed was *not* a machinegun.

There is absolutely no deterrent value to applying the heightened base offense level to individuals who have no knowledge that the weapon they possess, through manipulation, could be converted into a machinegun. In general, it is difficult to see deterrence value in punishing aggravating circumstances of which a defendant was not aware since he could not have corrected his conduct in deference to the particular criminal law. Mr. Travis, by choosing the semi-automatic version of the gun, demonstrated that he did not wish to possess the more dangerous machinegun. The

agents' attempted "gotcha" move of providing a gun that could technically be manipulated into a machinegun to an individual with no knowledge of such capacity offers no deterrent purpose.

Additionally, the ATF and the government should not be permitted to change their opinion of the character of an MP-5 when it suits them in order to manipulate the Court into a higher sentence. Both the ATF and the DOJ have taken the position, on the record, that MP-5s that do not shoot multiple rounds are not "fully automatic" weapons. In the 1993 trial regarding the raid of the Branch Davidian compound in Waco, Texas, numerous ATF agents testified that an MP-5 that could not shoot multiple rounds was not a machinegun. *See U.S. v. Brad Eugene Branch, et al.*, Crim. No. W-93-CR-046 (W.D. Tex.), Transcript of Trial Proceedings includes the following trial testimony of ATF Special Agents: Kevin Scott Richardson, MP-5 is a semiautomatic (at 1987, 1993–94, 2025); Lowell Sprague, MP-5s shoot two rounds with one pull of the trigger so they are only semiautomatics (at 2210–12); Kenneth King, MP-5s are not full automatics (at 2588–9); Bill Buford, MP-5 is a semiautomatic (at 2704, 2815); Kenneth Chisholm, no BATF agents had machine guns, even though they had MP-5s (at 3152–53), excerpts attached as Exhibit A. In the appeal of the trial verdict in the Fifth Circuit, the Department of Justice adopted this same position, asserting in their brief that although the agents carried MP-5 weapons, "none of the agents had fully automatic weapons." (Excerpt attached as Exhibit B). This testimony demonstrates that the government is fully aware that semi-automatic MP-5s are not properly termed fully-automatic machineguns. The Court should

15

decline to allow the government to selectively adopt different definitions of a machinegun to suit their ends.

### 3. Consideration of the Section 3553(a) Factors Counsels in Favor of a Sentence in Line with the Lower Base Offense Level.

Even if the Court were to find that the enhanced base offense level technically applies, whether as a result of a high-capacity magazine or the nature of the firearm, the Court should still consider whether such a base offense level appropriately reflects Mr. Travis's level of culpability, given particularized facts of this case. Mr. Travis does not argue that he should not be held accountable for his illegal possession of a firearm. But when the degree of punishment is driven largely by the nature of the firearm in question, and the nature of the firearm was chosen and made available by the undercover officers, it is appropriate for the Court to consider whether heightened punishment accurately reflects Mr. Travis's culpability, risk of recidivism, and the need for incapacitation in this case.

The ATF engages in sting operations in order to identify individuals disposed to commit certain crimes and to intercept them before they have the opportunity to do so. Mr. Travis concedes that this is a legitimate law enforcement practice. But the question of the appropriate sentence for conduct resulting from such a law enforcement operation becomes more complex when agents perform reverse-sting operations that present an opportunity to defendants that otherwise would not have occurred in the "real" world. *See, e.g.*, *United States v. Brown*, 299 F.Supp.3d 976, 987 (N.D. Ill. 2018) and *United States v. Paxton*, No. 13 CR 0103, 2018 WL 4504160, at *1 (N.D. Ill. Sept. 20, 2018) (discussing fictitious stash house robberies and the courts'

questions whether the offenses would have occurred absent law enforcement encouragement and facilitation). The guidelines, which rigidly measure the facts, are distorted by the artificial intervention of the agents.

The basic question here is, what crime would Xavier Travis have committed but for the intervention of the agents? If other, civilian individuals he encountered had offered him an opportunity to exchange drugs for guns, what would the outcome have been? And in this case, the evidence indicates that the outcome would have been different. The fact that his partners in the exchange were federal agents with access to weapons generally unavailable on the streets has influenced Mr. Travis's potential sentence in manner that has nothing to do with the purposes of punishment as enumerated by §3553(a).

As noted above, the facts demonstrate that Mr. Travis had no intention of seeking out a machinegun or a gun with a high-capacity magazine. Nothing in the record demonstrates that Mr. Travis had ever handled or come across a machinegun prior to meeting the agents. Indeed, although he displayed familiarity with handguns, Mr. Travis had never seen an MP-5 before and had to ask the agents what the gun was. This is clearly evidence that Mr. Travis did not have access to the type of more serious guns the ATF was able to supply. Because he had never come across such a gun before, and knew he was unlikely to find one again, Mr. Travis took the opportunity to buy a rare item that he otherwise never would have had access to. The idea that the agents "intercepted" a crime that could have taken place is belied by the fact that, without their intervention, Mr. Travis could never have gotten access to

such a weapon. The agents cannot truly disrupt a crime that had no practical chance of occurring. To punish Mr. Travis on the idea that such a crime *theoretically* could have occurred would be an inequitable result.

Section 3553(a) holds that the Court should consider protection of the public and deterrence in determining an appropriate sentence. To achieve these goals, the Court must determine a defendant's likelihood of reoffending, particularly the likelihood of engaging in the type of behavior the individual faces sentencing for. When the case before the sentencing court includes a degree of manipulated conduct, such as manufactured access to an aggravated type of weapon, the question becomes: will the individual commit the manipulated conduct again? Inherent in that question is whether the same criminal opportunity will present itself again to the defendant. For crimes involving opportunities manufactured by agents that would otherwise not occur, the answer is almost certain to be no. Essentially, the public needs less protection from an individual who has no means or motivation to access a machinegun, and does not even know of the firearm's capabilities. And a defendant who had no demonstrated ability to access such a weapon in the first place need not be subjected to an overly harsh sentence to be deterred from doing so again.

In the case of reverse-stings, it is difficult to discern exactly what conduct would have resulted but for the facilitation by law enforcement. But disregarding the manipulative hand of law enforcement and rigidly applying the guidelines flies in the face of Section 3553(a)'s mandate. Mr. Travis asks the Court, in its discretion, to

consider all of the relevant facts in determining the appropriate measure of the base offense level and the corresponding sentence.

### B. The 2K2.1(b)(6)(B) Enhancement.

The PSR recommends a four-level enhancement under §2K2.1(b)(6)(B) for possession of a gun in connection with another felony offense. Mr. Travis objects to the probation office's application of this enhancement.

The Seventh Circuit recently defined the scope of § 2K2.1(b)(6)(B) in *United States v. Gates*, 845 F.3d 310 (7th Cir. 2017). There, the Seventh Circuit held that § 2K2.1(b)(6)(B) did not apply in a case where the defendant merely received a gun as collateral for a drug sale. *Id.* at 311.

In reaching that conclusion, the *Gates* court emphasized that it was the buyer—rather than the defendant—who first raised the possibility of using a gun as collateral or payment for the drugs. *Id.* Under those circumstances, the Seventh Circuit found that the government did not carry its burden to show that the *Gates* defendant's possession of the gun *facilitated* the drug offense, as required by the Application Notes. *Id.* at 311–12; *see also* U.S.S.G. § 2K2.1(b)(6)(B), comment (n.14) (setting out the "facilitating" requirement). The Seventh Circuit concluded that the district court erred in applying the enhancement because "[t]here [wa]s no evidence that had it not been for the collateral the defendant would have cancelled his transaction with the buyer." *Gates*, 845 F.3d at 312. As the *Gates* court put it, "we don't know whether, had the defendant not had the gun, he would have obtained some substitute pawn from the buyer of the drugs from him, or if not would have trusted

19

the buyer to pay him eventually—for he hadn't asked the buyer to give him a gun as collateral." *Id*. at 311–12.

The same is true here. As the government and the probation office acknowledge, it was the undercover officer—not Mr. Travis—who first raised the possibility of exchanging guns for drugs. Gov't's Version of the Offense at 2–3; PSR at ¶¶ 10–11. While Mr. Travis ultimately agreed to the officer's proposal, the government cannot show that the guns facilitated a transaction that would not have otherwise occurred. Instead, the evidence shows that Mr. Travis was simply looking to exchange drugs for some item of value, whether that be cash, a television, or a gun. *Id*. As in *Gates*, Mr. Travis' possession of the gun "was thus as 'dangerous'" as if it "had instead been a Patek Philippe watch." *United States v. Gates*, 845 F.3d 310, 311 (7th Cir. 2017).

Those facts distinguish this case and *Gates* from earlier Seventh Circuit decisions like *United States v. Doody*, 600 F.3d 752, 755 (7th Cir. 2010). In those earlier decisions—which the Seventh Circuit expressly declined to follow in *Gates*— the government was able to show that the offer of the firearm was necessary to induce the drug transaction. *See Doody*, 600 F.3d at 756 ("unless Doody had been willing to take possession of the gun in exchange for drugs, the transaction could not have taken place") (emphasis added); *United States v. Schmitt*, 770 F.3d 524, 540 (7th Cir. 2014) (finding enhancement proper where defendant's "entire purpose . . . was to purchase the firearm"). Here, by contrast, the facts demonstrate that Mr. Travis was open to alternate transactions that did not involve a firearm. Gov't's Version of the Offense

at 2–2. As a result, the government has not established that Mr. Travis' possession of a firearm facilitated another felony offense and the § 2K2.1(b)(6)(B) enhancement does not apply.

### C. *Defendant's Guideline Calculations*

It is Mr. Travis's position that the weapon he possessed was not a machine gun, did not involve a high capacity magazine, and that the gun was not used in the course of a drug offense.  If the Court agrees with only the argument regarding the base offense level, the total offense level is 17 and the guideline range is 46-57 months. If the Court agrees with only the argument regarding the drug enhancement, the total offense level is 19 and the guideline range is 57-71 months.

## II.    ANALYSIS OF THE 3553(A) FACTORS.

Although sentencing courts must correctly calculate the guidelines, they may not presume that a guidelines sentence is the correct one, *Nelson v. United States*, 555 U.S. 350, 352 (2009), or even place "a thumb on the scale favoring a guideline sentence," *United States v. Pennington*, 667 F.3d 953, 958 (7th Cir. 2012) (internal quotations omitted); *see also Rita v. United States*. 551 U.S. 338, 351 (2007) (explaining that the district court judge "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply"). A thorough examination of the relevant factors in Mr. Travis's case supports the defense's request of a sentence of 54 months.

A. ***Mr. Travis's Life History Shows Him to Be a Young Man Overwhelmed with the Responsibility of Providing for His Family, and that Economic Struggles, Rather than a Propensity for Violence, Led Directly to this Offense,*** 18 U.S.C. § 3553(a)(1).

The Mitigation Report ("Report") submitted concurrent with this memorandum details the many struggles Xavier has faced in his young life.[4] The devastating loss, want, and violence that Xavier experienced from a very early age shows a pattern of instability and violence that dominated his developmental years. Although Xavier describes periods of happiness and growth, it's difficult to find a consistent stretch of time in his history where one can conclude that Xavier felt safe and provided for. The acute stress of his childhood clearly created in Xavier a desperate desire to find stability. That very basic instinct drove Xavier to make the poor choices that lead to his interactions with the criminal justice system.

The overwhelming theme that comes through Xavier's narrative is the responsibility that Xavier was forced to shoulder early in life. His single mother worked multiple jobs to support Xavier and his siblings, but the debt that crushed the family meant that money was scarce. Xavier was acutely aware of their lack of resources; he recalls feeling fear and shame that the other children at school could smell him because he wore the same clothes for days in a row. He spoke of days that the family skipped meals because there was no money for food. PSR ¶66. Xavier recounts the fear he felt when he would home from school to find that the lights had been turned off, or the electricity, or the gas. Report at 2. According to Xavier, the

---

[4] Due to the sensitive nature of the mitigation report, it will be submitted to chambers and the parties under separate cover.

family was perpetually on the edge of surviving. And although his mother was exceptionally supportive and loving through these struggles, her multiple jobs kept her from being physically present to watch over Xavier when he was young. The dearth of resources and attention was a perfect storm: Xavier was desperate to improve his circumstances, and as a young and immature teenager, had the space to take advantage of all the wrong opportunities.

In addition, Xavier's physically violent father literally pursued the family to repeatedly upend their security. Xavier's mother moved the family states away to try to create physical distance from her former partner, and when that failed, she moved home to try to create safety in the form of her siblings who offered protection against Xavier's father. Report at 1. Both his father's absence and his sudden, violent presence contributed to the volatility of his childhood.

Xavier's father was not the only source of violence in his childhood. As the PSR noted, in both Joliet and Georgia, Xavier's family lived in housing projects afflicted with gang violence and the drug trade. PSR ¶65. Xavier recalls that, as a child, he often witnessed drug transactions and use, as well as extreme violence, including murders. *Id*. He witnessed close friends and relatives die, including what amounted to executions in front of his face. Report at 3.

Through it all, Xavier struggled to stay on the right path. He fought against the neighborhood influences and was able to focus on sports and school for much of his early adolescence. Xavier dreamed of a career as an athlete, and his prowess on the field earned him a scholarship to a private high school that Xavier saw as his way

23

out of a life of struggles. But a tragic medical error brought his dreams to a halt. Doctors misdiagnosed his rupture appendix and performed a spinal tap that ended Xavier's ability to play sports. Report at 4.

The combination of the depression at having his dream ripped away and the stress of having created a further financial burden with his medical problem created a desperation in Xavier. He had always felt a strong, instinctual need to take care of his family in the way his father never did, and at the age of 12, Xavier decided to act on that instinct. One day after he came home to find both the lights and the heat off in the house, and his mother crying, Xavier decided to try to take matters into his own hands. Report at 5. He ventured out into life in the streets as a young teenager not because he thought the lifestyle was glamorous, but out of a desire to provide basic necessities for his family. Xavier did not get involved in the drug trade in order to buy himself luxuries or flashy clothes; he sold drugs to pay the family's bills. In the neighborhoods where he lived, it was the financial opportunity he saw modelled for him, and he mimicked the path that was normalized to him.

Xavier's association with the streets predictably led to trouble. In 2012, Xavier spent a little over two years in the Illinois Department of Corrections, the longest term he has ever served. He missed the birth of his first son while in custody, which he regrets that immensely. Upon his release, the mother of his child dropped the toddler off and never returned. Report at 7. Since that day, Xavier has been the primary guardian of his son. Xavier explains that being a father turned his life around. He stopped selling drugs and found a job first at Caterpillar, driving a

24

forklift, and then at a series of factories doing similar work. Although he stumbled with arrests for traffic-related incidents, Xavier largely managed to stay away from the street lifestyle that took him away from his family. PSR ¶45-49. His son's birth also encouraged Xavier to try to reconnect with his own father, and to find forgiveness for his father's sins and shortcomings. Xavier made an effort to integrate himself into his father's new family, becoming an uncle to the young boys. Tragically, in 2016, Xavier's father was shot and killed.

In the time leading up to his arrest in 2018, Xavier was trying to right his path. He was in a supportive, loving relationship with a woman who he viewed as his equal partner. He had full custody of his young son and had taken on the responsibility of providing for his father's young children. Xavier got a job doing construction work and tried to work as many hours as possible to provide for his extended family. But sadly, Xavier's efforts weren't enough to the keep the family afloat. Xavier's job paid minimum wage and he was unable to pick up overtime shifts to increase his hours because his access to transportation was limited due to his lack of a license. Faced with the weight of providing food for so many hungry mouths, buying school clothes for nine growing children, paying rent for his own house and trying to help his mother, Xavier turned back to making extra money on the streets. He caught the eye of the ATF agents and made the biggest mistake of his young life.

None of Xavier's encounters with the law were as a result of a desire to engage in violence or be a part of a dangerous gang. Both the PSR and the Report confirm this. PSR ¶73; Report at 11, n.3. The extreme poverty of his childhood motivated him

to seek stability and safety, but the road from the projects to those goals wasn't easy. Eventually, the weight of the responsibility Xavier shouldered by trying to take care of his family overwhelmed him, and he tried to supplement his paycheck with money from the streets.

B. ***Mr. Travis's Solid Plan for Stability Upon Release Significantly Reduces his Risk of Recidivism, 18 U.S.C. § 3553(a)(2)(c)***.

Much of Xavier's interactions with law enforcement over the years have come as a result of his economic situation, whether directly or indirectly. But upon his release from federal custody, Xavier and his family have a concrete plan to keep him on a productive path and out of the street economy.

In the past few years, Xavier's brother Clark has begun building his own trucking company. He is fortunate to have experienced a great degree of success, and plans to expand his business over the next few years. As noted in his letter to the Court, he has committed to providing Xavier with a job upon his release, whether in Memphis or elsewhere.[5] As the Court is aware, driving with a commercial driver's license can be a lucrative job, and is an industry open to individuals with criminal histories. Clark's entrepreneurial drive has translated into a significant opportunity for Xavier.

In addition, Clark is willing to offer Xavier a home away from the community that has caused so much pain in his life. The opportunity to live with his brother in a new city offers a fresh start for Xavier and a level of support that he has never had before. Xavier is lucky enough to have custody of his son, and an excellent relationship with

---

[5] Letters to the Court from Mr. Travis's family and supporters will be provided to the Court and parties under separate cover.

the mother of his daughter, such that his family is willing to move with him to ensure Xavier's success and the success of their family as a whole. Report at 13.

The opportunities in front of Xavier offer much-needed stability – both financial and familial. His family's support is critical to Xavier's success going forward, but the most important element of the equation is Xavier's own recognition of what it will take to successfully commit to being a contributing member of the community and a law-abiding citizen. Xavier's reflections, as documented in the Mitigation Report, show an understanding of the mistakes he has made and the corrections he needs to make to address the poor decision-making and impulses that have led him to this point. Xavier's primary motivation going forward is to provide for his family in a manner that keeps him present in their lives.

C. ***Mr. Travis's Traffic-Related Convictions Have Led to an Inflation of the Seriousness of his Criminal Background*, 18 U.S.C. § 3553(a)(1).**

The PSR reflects Mr. Travis's contacts with law enforcement over the years and correctly calculated a criminal history score of ten points, resulting in Mr. Travis's placement in CHC V. Three of those criminal history points, however, are the result of convictions for driving on a suspended or revoked license. PSR ¶¶ 46, 49. These convictions are responsible for elevating Mr. Travis from CHC IV to CHC V and increasing the bottom of the guideline range by nearly ten months.

Although convictions for driving without a license do properly count under the guidelines and show a failure to abide by traffic laws, they are not the type of convictions that are necessarily indicative of Mr. Travis's propensity for recidivism or the need to protect the public from future crimes. Typically, pursuant to Guideline

4A1.2(c)(1), convictions for driving without a license do not receive criminal history points because they are misdemeanors with little relevance to the sentencing factors. Only convictions that resulted in sentences over 30 days are counted. *See* §4A1.2(c)(1).

In the case of Mr. Travis's 2017 conviction, PSR ¶49, the judgment shows that Mr. Travis was given a sentence of 30 days' time considered served and conditional discharge. The time "considered served" appears not to be time he actually did on the traffic violation, but rather time Mr. Travis served in IDOC on an unrelated 2016 conviction. The court therefore imposed no actual additional time on Mr. Travis and just a term of conditional discharge. The length of that custodial sentence was therefore somewhat arbitrary, and had the judge ordered 29 days' credit, the conviction would not count for criminal history points. In a practical sense, this conviction does little to inform the Court about Mr. Travis's projected likelihood to commit future crimes, yet it shifts Mr. Travis into CHC V. This overly technical application of the guidelines suggests a sentence that is greater than necessary to accomplish deterrence for Xavier. More holistic view of Xavier's history would place him in CHC IV.

Additionally, the equities in counting these types of convictions are in dispute because studies have shown that there are dramatic racial disparities in driver's license suspensions and arrests related to unpaid traffic fines and fees. *See, e.g.,* Lawyer's Committee for Civil Rights of the San Francisco Bay Area, *Stopped, Fined, Arrested: Racial Bias in Policing and Traffic Courts in California* (April 2016) available at: https://ebclc.org/backontheroad/problem/ (finding that driver's licenses

are too frequently suspended for reasons unrelated to protecting public safety, often imposing detrimental consequences on those living in poverty). Recently, Governor Pritzker signed the "License to Work Act" into law in Illinois, which eliminates driver's license suspensions for most non-moving violations. The Act recognizes that license suspensions for unpaid fines reinforce a cycle of instability and unnecessarily punish individuals who are already in under-resourced. *See* Associated Press, *Illinois law eliminates license suspension for non-moving violations*, available at: https://jg-tc.com/news/state-and-regional/govt-and-politics/illinois-law-eliminates-license-suspension-for-non-moving-violations/article_65b554d8-f1fa-5831-86d7-9105684fd19b.html; *see also* License to Work Illinois, https://www.license2work.org/. Mr. Travis contends that he falls into this group. Although his license was initially suspended as a result of moving violation, Mr. Travis was unable to reinstate his license for year due to the extremely high cost of the related fees. These convictions are therefore more reflective of his financial condition than his risk of recidivism, and the Court should decline to allow them to inflate Mr. Travis's sentence.

D. ***The Requested Sentence is By Far the Longest Xavier Has Served, and Appropriately Reflects the Seriousness of the Offense and Provides Just Punishment***, 18 U.S.C. § 3553(a)(2)(a).

The sentence proposed by the defense is sufficient, but not greater than necessary, to promote the 3553(a) goals of sentencing. Possession of firearms is a serious offense, and the defense has suggested a serious, within-guideline sentence of 54 months. The longest period of time Xavier has spent in custody was roughly two years and three months, as a result of his 2012 conviction. The requested sentence is double that term

29

to reflect the seriousness of this offense, provide a greater degree of deterrence, and punish the conduct as equitably measured by the guidelines.

### III.  PROPOSED CONDITIONS OF SUPERVISED RELEASE

In the PSR, the Probation Office recommends fairly standard conditions of supervised release. For the most part, the proposed conditions appear to be supported by the facts and circumstances of this case, and do not seem to be more burdensome than necessary. With the exception of the condition outlined below, the defense has no objection to the proposed conditions:

• *Special Condition* #1 – As the supplement to the PSR noted, Mr. Travis has his GED. Therefore, this condition is unnecessary.

• *Special Condition* #3 – This condition requests that Mr. Travis perform at least 20 hours of community service a week if he is not employed within 60 days of release. Mr. Travis notes that searching for and applying for jobs is often a time-consuming process, and that Special Condition #2 requires him to participate in a job skill-training program in that first 60 days as well. To the extent that the community service hours requirement interferes with Mr. Travis's ability to look for gainful employment, this condition should not be imposed.

• *Special Condition* #13 – This condition requires Mr. Travis to observe a reentry court session. In counsel's experience, reentry court serves the needs of those struggling with the conditions of supervised release. There is no indication Mr. Travis requires the structure of reentry court, and observation of a session may take him

away from a workday. The condition may be appropriate if Mr. Travis demonstrates difficulty while on supervised release, but should not be imposed at this juncture.

### CONCLUSION

Mr. Travis understands that his crime was serious. He knows that there is nothing he can say to excuse his actions, but he is focused on serving his time and moving on to a new future, ripe with opportunity. He asks the Court to consider the Supreme Court's logic in *Gall*, where the Court reasoned that respect for the law is promoted when harsh punishment is tempered by consideration of an offender's character and personal history, in addition to the specific characteristics of the case at hand. *See* 552 U.S. at 54.

Wherefore, based on the sentencing factors and arguments set forth above, Xavier Travis respectfully requests that this Court impose a sentence of 54 months' custody.

<div style="margin-left: 40%;">

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John F. Murphy,
Executive Director

By:   s/ *Amanda G. Penabad*
Amanda G. Penabad
Attorney for Xavier Travis

</div>

FEDERAL DEFENDER PROGRAM
55 East Monroe Street, Suite 2800
Chicago, Illinois 60603
(312) 621-8326

# Exhibit A

FORM LASER BOND A PENGAD·INDY 1-800-631-6989

2298

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF TEXAS

3    WACO DIVISION

FILED
NOV 28 1994
CLERK, U.S. DIST. COURT
BY _____ DEPUTY

4

5  UNITED STATES OF AMERICA     *    CRIMINAL ACTION NO.
                                   *    W-93-CR-046(2)(3)
6  VS.                           *    (4)(5)(6)(7)(8)(9)
                                   *    (10)(11)&(12)
7  BRAD EUGENE BRANCH,        *
    KEVIN A. WHITECLIFF,      *
8  CLIVE J. DOYLE,           *
    JAIME CASTILLO,           *
9  LIVINGSTON FAGAN,         *
    PAUL GORDON FATTA,        *
10  WOODROW KENDRICK,         *
    A/K/A BOB KENDRICK,       *
11  NORMAN WASHINGTON ALLISON,  *
    A/K/A DELROY NASH,       *
12  GRAEME LEONARD CRADDOCK,    *    January 24, 1994
    RENOS AVRAAM and         *
13  RUTH OTTMAN RIDDLE        *    San Antonio, Texas
    * * * * * * * * * * * * * *

14  BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING,

15  AND A JURY

16  APPEARANCES:

17  For the Government:        Mr. W. Ray Jahn,
18                        Mr. William W. Johnston,
                        Mrs. LeRoy M. Jahn,
19                        Mr. John A. Phinizy and
                        Mr. John M. Lancaster
                        Assistant U.S. Attorneys
20                        P.O. Box 828
                        Waco, Texas  76703
21

22  For Defendant Branch:      Mr. Douglas Tinker
                        Attorney at Law
23                        622 Tancahua
                        P.O. Box 276
                        Corpus Christi, Texas  78403
24                        and
                        Mr. Richard G. Ferguson
25                        Attorney at Law
                        P.O. Box 1157
                        Waco, Texas  76703

2540

1   avoid the problem and do it in the morning, if you want to.

2           THE COURT:  Or do it at five.

3           MR. ROSEN:  That's fine.  Thank you.

4       (End of bench conference.)

5           MR. JOHNSTON:  May I have just a moment, Your Honor,

6   to make sure?

7           THE COURT:  Yes.

8           Will you step back outside, sir.

9           MR. LANCASTER:  The Government would call "Kenny"

10  King.

11   (Witness sworn.)

12          MR. LANCASTER:  Your Honor, before we get started, if

13  we could we just turn the model around, please?

14          THE COURT:  Sure.

15          MR. LANCASTER:  May I proceed, Your Honor?

16          THE COURT:  Please, sir.

17              KENNETH KING, GOVERNMENT WITNESS, SWORN

18                       DIRECT EXAMINATION

19  BY MR. LANCASTER:

20  Q    Would you tell the ladies and gentlemen of the jury what

21  your name is, please?

22  A    It's Kenneth King.

23  Q    And where do you work?

24  A    I'm a Special Agent for the Bureau of Alcohol, Tobacco and

25  Firearms.

FORM LASER BOND A PENGAD INDY 1-800-631-6989

2541

1    Q    And how long have you been with the ATF?

2    A    I've been with ATF for approximately 18 years.

3    Q    And prior to that, what did you do?

4    A    Prior to that, I was with -- a trooper with the Florida

5    Highway Patrol for approximately six and a half years.  Prior to

6    that, I was in the United States Marine Corps for approximately

7    seven years.

8    Q    Where did you go to college?

9    A    I went to college at the University of South Florida in

10   Tampa, Florida.

11   Q    Mr. King, taking you back to February 28th, 1993, did you

12   have an opportunity to be in Waco, Texas, for the execution of a

13   search warrant?

14   A    Yes, I was.

15   Q    And what were you -- and what were your duties regarding

16   the execution of this search warrant?

17   A    I was the team leader for the New Orleans Special Response

18   Team.

19   Q    And as -- as team leader, what were your duties regarding

20   searching the compound?

21   A    For the actual on the compound, we had divided the team

22   into several teams within the team, and I was to make an entry

23   on the roof on the chapel area by ladder and go up on the roof

24   and make entry through a window into what we thought was in the

25   living quarters for David Koresh.

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1    A    At Special Agent Millen.

2    Q    Okay.  And you nodded, because you didn't want to call out,

3    because that would be too loud, isn't that right?

4    A    No, sir.  Just -- it was just that we were ready.

5    Q    That you were ready?

6    A    Yes.

7    Q    You didn't holler at him, "Hey, we're ready to go, are you

8    ready to go," did you?

9    A    I wouldn't under any other circumstances, either, I would

10   just -- it was a nod and knew we were ready.

11   Q    That you were ready, and then after the nod, you went

12   forward, is that right?

13   A    Yes, sir.

14   Q    Okay.

15          THE COURT:  Any other questions of this witness?  Mr.

16   Carroll.

17                    RECROSS-EXAMINATION

18   BY MR. CARROLL:

19   Q    How was agent LeBleu armed as he went onto the roof?

20   A    Agent LeBleu was armed with a shotgun, and he had a

21   Sig-Sauer pistol.

22   Q    How was Agent McKeehan armed as he went onto the roof?

23   A    Special Agent McKeehan had an MP-5 and also was armed with

24   a Sig-Sauer pistol.

25   Q    And how was Agent Millen armed?

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

King - Recross (Mr. Carroll)                    2589

1   A    He was armed with an MP-5 and also with a Sig-Sauer pistol.

2   Q    And the two MP-5's that you've described, those are weapons

3   capable of filing -- firing in an automatic mode, is that

4   correct?

5   A    No, sir.

6   Q    They do not fire a two-round burst?

7   A    I'm not sure that -- on one of them, I'm not sure whether

8   he had the single-shot or whether he had the two-shot burst, I'm

9   not sure.

10  Q    You're just not sure?

11  A    No, sir.

12  Q    All right.

13           MR. CARROLL:  Thank you.

14           THE COURT:  You may step down, sir.

15           And we'll recess for the day until nine o'clock in the

16  morning.  Ladies and Gentlemen of the Jury, please remember the

17  instructions I have given you each day to isolate yourselves

18  from any information concerning this case except here in the

19  courtroom.  See you in the morning.

20       (Jury out.)

21           THE COURT:  Be seated, everyone.

22           Do we have the people we need to take care of this

23  hearing?

24           MR. ROSEN:  We're ready, Judge.

25           MR. JOHNSTON:  Yes, sir, he's outside.

FORM LASER BOND A PENGADINDY 1-800-631-6989

1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE WESTERN DISTRICT OF TEXAS

3                      WACO DIVISION

```
FILED  1825
NUV 28 1994
CLERK, U.S. DIST. COURT
BY _____ DEPUTY
```

4

5   UNITED STATES OF AMERICA     *     CRIMINAL ACTION NO.
                                *     W-93-CR-046(2)(3)

6   VS.                           *     (4)(5)(6)(7)(8)(9)
                                *     (10)(11)&(12)

7   BRAD EUGENE BRANCH,         *
    KEVIN A. WHITECLIFF,       *

8   CLIVE J. DOYLE,            *
    JAIME CASTILLO,            *

9   LIVINGSTON FAGAN,         *
    PAUL GORDON FATTA,        *

10   WOODROW KENDRICK,         *
    A/K/A BOB KENDRICK,       *

11   NORMAN WASHINGTON ALLISON,   *
    A/K/A DELROY NASH,        *

12   GRAEME LEONARD CRADDOCK,    *     January 20, 1994
    RENOS AVRAAM and         *

13   RUTH OTTMAN RIDDLE        *     San Antonio, Texas
    * * * * * * * * * * * * * *

14   <u>BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING,</u>

15                      <u>AND A JURY</u>

16   <u>APPEARANCES</u>:

17   For the Government:         Mr. W. Ray Jahn,
                            Mr. William W. Johnston,

18                             Mrs. LeRoy M. Jahn,
                            Mr. John A. Phinizy and

19                             Mr. John M. Lancaster
                            Assistant U.S. Attorneys

20                             P.O. Box 828
                            Waco, Texas  76703

21

22   For Defendant Branch:      Mr. Douglas Tinker
                            Attorney at Law

23                             622 Tancahua
                            P.O. Box 276

24                             Corpus Christi, Texas  78403
                                and

25                             Mr. Richard G. Ferguson
                            Attorney at Law
                            P.O. Box 1157
                            Waco, Texas  76703

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

Richardson - Direct (Mr. Johnston)                    1987

1   Q    You'll need those microphones in just a moment after I

2   introduce you.  Thank you.  Please state your name for the

3   record now and how you're employed.

4   A    My name is Kevin Scott Richardson, currently I'm a Special

5   Agent with the U.S. Treasury Department, Bureau of Alcohol,

6   Tobacco and Firearms.

7   Q    And how many years have you been a special agent with ATF?

8   A    Almost about five years.

9   Q    And what capacity do you serve in, at this time, with ATF?

10  A    Currently I'm assigned to the bureau headquarters in

11  Washington, D.C.  I'm considered a Project Officer for the

12  Special Operations Division, Tactical Operations Branch.

13  Q    And were you employed with ATF as a special agent back in

14  early 1993?

15  A    Yes, I was.

16  Q    Specifically, on February 28th, did you have an occasion to

17  go to Waco, Texas, on the morning of the 28th?

18  A    Yes, I did.

19  Q    And why were you there?

20  A    On February 28th, I was assigned to the Houston Field

21  Division to the Special Response Team.  I worked the Organized

22  Crime Drug Enforcement Task Force, at that time, and I was part

23  of the entry team that was going to execute a search warrant in

24  Waco, Texas.

25  Q    At what location?

Richardson - Direct (Mr. Johnston)                    1993

1    emanating from the house.

2    Q    And what type of firearms did you have available to you

3    that day?

4    A    I was carrying two firearms.  I was carrying a MP-5, which

5    is a 9-millimeter, semiautomatic, basically, a rifle, as we

6    described those.  And I also had a Sig-Sauer pistol, which was

7    holstered, at the time.

8    Q    All right.  And describe, then, what you did after the

9    volume of fire you described.  Take it from there, please.

10   A    As I moved to the -- to the side of the house, I had a jam,

11   basically, in the MP-5, which is the semiautomatic rifle that I

12   had, it jammed on me.

13   Q    What happened?  What did it actually look like and what did

14   it feel like?

15   A    It basically stopped firing, and what I did was to try to

16   as quickly as possible just move to the house.  And what we --

17   things that we practice with the Special Response Teams on

18   clearing the jam as fast as possible, there's a couple of things

19   that we normally would do is -- one of the things is, is that if

20   that semiautomatic would jam on you, we want you to go ahead and

21   place it to the side and then draw from your pistol, to use your

22   pistol as a backup weapon.

23   Q    What did you do?

24   A    Well, because of the volume of gunfire that was coming out

25   of the compound, I realized that I needed to try to clear the

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1    jam from that semiautomatic, to make sure that I had something I

2    could use in my defense.  So as I got to the house, it gave me

3    enough time to go ahead to clear it, to seat another magazine or

4    to place another magazine up into it, to make it fire once

5    again.

6    Q    Then what did you do?  And describe it using the model,

7    please, where you were and what you saw.

8    A    I was still positioned right here (indicating).  There was

9    another special agent by the name of Kris Mayfield and Special

10   Agent John Williams.  There was a container, I was directly

11   right here in front of this window (indicating), that they were

12   down behind, trying to get some type of cover.

13   Q    And you're gesturing toward the lower right-hand window at

14   the front of the compound?

15   A    Right about right here (indicating).

16   Q    Yes.  Okay.  Go ahead.

17   A    What I did -- what I was also carrying, at that time, is

18   what we call a "diversionary device," I had two diversionary

19   devices.  It's used by different terms.  Some people call them

20   "flash-bangs," but basically what it does is, it emanates a

21   bright light and then it gives you a very loud -- a loud sound,

22   a loud boom.  And what they are used for is exactly what the

23   word is describing, "diversionary," it -- it temporarily

24   disorientates (sic) a person, which would allow you to go ahead

25   and to get control of the situation.

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

Richardson - Cross (Mr. DeGeurin)                    2025

1   A    It was basically, "We're getting ready to go, and hurry up,

2   let's go."

3   Q    Okay.  All right.  Thank you, Agent Richardson.

4                          CROSS-EXAMINATION

5   BY MR. DeGEURIN:

6   Q    Agent Richardson, I'm Mike DeGeurin, and I -- you look

7   familiar to me, have we met before?

8   A    Not to my knowledge, sir.

9   Q    All right.  This MP-5, you called it a "semiautomatic

10  rifle, short barrel rifle," or something like that.  Is -- I

11  wanted -- I'm just -- that may not have been your exact words,

12  that's what I jotted down.  Is that one of those little, it kind

13  of looks like a submachine gun, but it's actually a

14  semiautomatic or one like that?

15  A    It's a semiautomatic rifle, sir.

16  Q    It's one that you can actually operate with one arm, if you

17  wanted to, one hand?

18  A    It -- it's not posed for operation by one hand for

19  accuracy, and --

20  Q    You're supposed to hold it and shoot like this

21  (indicating), then?

22  A    No.  We're trained to use two hands, just basically like

23  you would hold a conventional rifle.

24  Q    Is it designed, Agent Richardson, for ready, aim, fire or

25  for shooting from your shoulder?

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

1

IN THE UNITED STATES DISTRICT COURT

2

FOR THE WESTERN DISTRICT OF TEXAS

3

WACO DIVISION

FILED
NOV 2 8 1994
CLERK, U.S. DIST. COURT
BY _____ DEPUTY

2922

4

5   UNITED STATES OF AMERICA      *     CRIMINAL ACTION NO.
                             *     W-93-CR-046(2)(3)

6   VS.                       *     (4)(5)(6)(7)(8)(9)
                             *     (10)(11)&(12)

7   BRAD EUGENE BRANCH,         *
   KEVIN A. WHITECLIFF,       *

8   CLIVE J. DOYLE,           *
   JAIME CASTILLO,           *

9   LIVINGSTON FAGAN,        *
   PAUL GORDON FATTA,       *

10  WOODROW KENDRICK,        *
   A/K/A BOB KENDRICK,       *

11  NORMAN WASHINGTON ALLISON,  *
   A/K/A DELROY NASH,       *

12  GRAEME LEONARD CRADDOCK,   *     January 26, 1994
   RENOS AVRAAM and        *

13  RUTH OTTMAN RIDDLE       *     San Antonio, Texas
   * * * * * * * * * * * * * * *

14   BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING,

15   AND A JURY

16  APPEARANCES:

17  For the Government:        Mr. W. Ray Jahn,
                         Mr. William W. Johnston,

18                        Mrs. LeRoy M. Jahn,
                         Mr. John A. Phinizy and

19                        Mr. John M. Lancaster
                         Assistant U.S. Attorneys

20                        P.O. Box 828
                         Waco, Texas  76703

21

22  For Defendant Branch:      Mr. Douglas Tinker
                        Attorney at Law

                        622 Tancahua

23                        P.O. Box 276
                        Corpus Christi, Texas  78403

24                           and
                        Mr. Richard G. Ferguson

25                        Attorney at Law
                        P.O. Box 1157
                        Waco, Texas  76703

1415

De Los Santos - Cross (Mr. Rentz)                    3103

1          THE COURT:  Sustain the objection.

2    BY MR. RENTZ:

3    Q    Well, what did he tell you his duties were?

4          THE COURT:  Sustain the objection.  It's hearsay, Mr.

5    Rentz.

6          MR. RENTZ:  Sir?

7          THE COURT:  It's hearsay.

8          MR. RENTZ:  Well, this is what he told him at the --

9          THE COURT:  That's what makes it hearsay.

10         MR. RENTZ:  Okay.  I'll offer that later.  Thank you.

11         THE COURT:  Any other questions of this witness?

12         MR. TINKER:  Your Honor, I would, before he's excused,

13   I would like to ask a few questions under Rule 103, Your Honor,

14   that's not before the jury, it's a proffer.

15         THE COURT:  All right, sir.  You may step down, sir.

16   Remain available, please.

17         THE WITNESS:  Yes, sir.

18         THE COURT:  Next witness.

19         MR. LANCASTER:  The Government will call Kenneth

20   Chisholm.

21      (Witness sworn.)

22         MR. LANCASTER:  May I proceed, Your Honor?

23         THE COURT:  Yes, sir.

24     KENNETH CHISHOLM, GOVERNMENT WITNESS, SWORN

25                  DIRECT EXAMINATION

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

Chisholm - Direct (Mr. Lancaster)                    3104

1    BY MR. LANCASTER:

2    Q     Will you state your name for the record, please.

3    A     Kenneth Chisholm, that's C-h-i-s-h-o-l-m.

4    Q     Mr. Chisholm, where do you work?

5    A     I'm a Special Agent for the U.S. Department of Treasury,

6    Bureau of Alcohol, Tobacco and Firearms.  I'm presently

7    stationed in Shreveport, Louisiana.

8    Q     How long have you been with the ATF?

9    A     Approximately five years and six months.

10   Q     And prior to that, what did you do?

11   A     I was a police officer in the City of North Little Rock,

12   Arkansas, for 11 years.

13   Q     Where did you go to college?

14   A     At the University of Arkansas at Little Rock.

15   Q     Did you participate back on February 28th, 1993, on the

16   execution of a search warrant at the Mount Carmel Compound near

17   Waco, Texas?

18   A     Yes, sir, I did.

19   Q     And what were your duties regarding the execution of that

20   search warrant?

21   A     I was a member of the New Orleans Special Response Team.

22   My primary job was medic for our team and to provide cover for

23   the seven-man entry team that would make entry into the second

24   story apartment.

25             MR. LANCASTER:  Your Honor, may the witness and myself

Case: 1:18-cr-00522 Document #: 81 Filed: 02/18/20 Page 46 of 61 PageID #:401

Chisholm - Cross (Mr. Carroll)                    3152

1    A    No, sir.  I testified that I was a cover man for that team.

2    Q    That's -- that's what I mean, you weren't up on the roof.

3    A    No, sir.

4    Q    I'm not suggesting that, but you were a cover man for that

5    team, you were working with them?

6    A    That is correct.

7    Q    And part of that team was Special Agent Conway LeBleu, is

8    that right?

9    A    That is correct, sir.

10   Q    And you observed him, along with other members of that

11   team, correct?

12   A    Yes, sir, I did.

13   Q    And that day, you observed him on the roof firing toward

14   the tower, is that right?

15   A    I observed him on the roof, yes, sir, firing toward that

16   tower.

17   Q    And shortly thereafter, you saw that he was shot?

18   A    I observed Conway LeBleu being murdered, yes, sir.

19   Q    That was after you saw him firing rounds toward the tower?

20   A    Well, yes, obviously, sir, he was murdered shortly after

21   that.

22   Q    You stated that no one out there, no ATF agents had machine

23   guns, is that right?

24   A    That is correct, sir.

25   Q    Now, your understanding of a machine gun is an automatic

Chisholm - Cross (Mr. Carroll)                3153

1   weapon, correct?

2   A      Yes, sir.

3   Q      And you're aware that the definition of an "automatic

4   weapon" is a weapon that fires more than one round with a single

5   pull of the trigger, correct?

6   A      Yes, sir, that is correct.

7   Q      Are you aware that there were several agents, ATF agents,

8   who had MP-5's that fired more than one round with a single pull

9   of the trigger?

10  A      Sir, what I think I said was "fully automatic weapons."

11  That particular weapon fires two shots, you have to release the

12  trigger and pull it again.  In my mind, that is not a fully

13  automatic weapon.  A fully automatic weapon, when you pull the

14  trigger, it will fire the entire magazine.

15  Q      But that weapon is not semiautomatic, is it, it's

16  automatic?

17  A      It's not fully automatic, by my definition.

18  Q      But it's not semiautomatic, is it?

19  A      It is not a semiautomatic.

20  Q      Finally, I want to ask you -- you're on a Special Response

21  Team, right?

22  A      That is correct, sir.

23  Q      Every ATF agent is not on a Special Response Team, right?

24  A      That is correct, sir.

25  Q      And is that something that a lay person like me might refer

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

```
                                                                    2629
 1                                          ┌─────────────────────────┐
              IN THE UNITED STATES DISTRICT COURT   FILED
 2                                          │   NOV 28 1994           │
           FOR THE WESTERN DISTRICT OF TEXAS
 3                                          │ CLERK, U. S. DIST. COURT│
                    WACO DIVISION           │ BY _____ DEPUTY  │
 4                                          └─────────────────────────┘

 5    UNITED STATES OF AMERICA        *      CRIMINAL ACTION NO.
                                      *      W-93-CR-046(2)(3)
 6    VS.                             *      (4)(5)(6)(7)(8)(9)
                                      *      (10)(11)&(12)
 7    BRAD EUGENE BRANCH,             *
      KEVIN A. WHITECLIFF,            *
 8    CLIVE J. DOYLE,                 *
      JAIME CASTILLO,                 *
 9    LIVINGSTON FAGAN,               *
      PAUL GORDON FATTA,              *
10    WOODROW KENDRICK,               *
      A/K/A BOB KENDRICK,             *
11    NORMAN WASHINGTON ALLISON,      *
      A/K/A DELROY NASH,              *
12    GRAEME LEONARD CRADDOCK,        *      January 25, 1994
      RENOS AVRAAM and                *
13    RUTH OTTMAN RIDDLE              *      San Antonio, Texas
      * * * * * * * * * * * * * * *

14       BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING,

15                            AND A JURY

16    APPEARANCES:

17    For the Government:          Mr. W. Ray Jahn,
                                   Mr. William W. Johnston,
18                                 Mrs. LeRoy M. Jahn,
                                   Mr. John A. Phinizy and
19                                 Mr. John M. Lancaster
                                   Assistant U.S. Attorneys
20                                 P.O. Box 828
                                   Waco, Texas  76703
21
      For Defendant Branch:        Mr. Douglas Tinker
22                                 Attorney at Law
                                   622 Tancahua
23                                 P.O. Box 276
                                   Corpus Christi, Texas  78403
24                                        and
                                   Mr. Richard G. Ferguson
25                                 Attorney at Law
                                   P.O. Box 1157
                                   Waco, Texas  76703
```

1414

Orchowski - Redirect (Mr. Johnston)                2686

1          MR. JOHNSTON:  That's all I have.  Pass the witness.

2          THE COURT:  Anything else of this witness?

3          The witness may step down, and we'll take our morning

4    recess, at this point.

5          (Recessed from 10:15 a.m. until 10:40 a.m.)

6          (Jury in.)

7          THE COURT:  Be seated, everyone.

8          Mr. Lancaster, who would you call next?

9          MR. LANCASTER:  The Government would call William

10   Buford, Your Honor.

11          (Witness sworn.)

12          MR. LANCASTER:  May I proceed, sir?

13          THE COURT:  Please, sir.

14          MR. LANCASTER:  Thank you.

15          <u>BILL BUFORD, GOVERNMENT WITNESS, SWORN</u>

16                 <u>DIRECT EXAMINATION</u>

17   BY MR. LANCASTER:

18   Q    Would you state your name for the record, please.

19   A    My name is Bill Buford.

20   Q    Mr. Buford, where do you work?

21   A    I work for the Bureau of Alcohol, Tobacco and Firearms in

22   Little Rock, Arkansas.

23   Q    And how long have you worked for the Bureau of Alcohol,

24   Tobacco and Firearms?

25   A    Twenty-two years.

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

Buford - Direct (Mr. Lancaster)                          2704

1   Q    Were you able to observe some of the activities of some of

2   the agents on that side?

3   A    Yes, I was.

4   Q    Did you have an opportunity to observe Agent Williams?

5   A    Yes, I did.

6   Q    Where was Agent Williams situated?

7   A    Agent Williams was behind a safe located right here

8   (indicated).

9   Q    All right.  What was he doing when you saw him?

10  A    He was -- when we were receiving incoming fire, he was

11  attempting to suppress it.

12  Q    And how was he armed?

13  A    He had a MP-5, an H & K MP-5, semiautomatic rifle.

14  Q    What did you observe happen to Agent Williams?

15  A    After -- I'm not sure how far into the -- into the gunfight

16  it was, probably 10 minutes or so, "Rob" appeared to have been

17  struck, he fell straight back from the safe and laid back there.

18  And I hollered at him, I asked him -- I remember yelling

19  "'Robbo,' are you okay?"  And he crawled back up and said he was

20  okay, that he wasn't hit.

21  Q    And then what happened?

22  A    We received some additional fire.  He raised up to fire

23  again and was struck through the head.

24  Q    And what was the effect of that -- that round striking him,

25  as you perceived it?

1   A     It's been a long time.  I believe Agent Chisholm carried

2   it.

3   Q     And in the event that a fire would start, he was going to

4   come up and put it out?

5   A     Yes, or just throw us up the fire extinguisher.

6   Q     And where was he stationed in -- in your portion of the

7   raid?

8   A     Directly below the ladder that I climbed.

9   Q     Okay.  And he was to stay down there at the bottom of the

10  ladder?

11  A     Yes.

12  Q     You've mentioned someone was using -- I forget which one --

13  Jordan or someone had a MP-5, I think you said, semiautomatic

14  rifle?

15  A     Yes.

16  Q     That's a little kind of short rifle?

17  A     Yes.

18  Q     When you say "semiautomatic," it has as switch on it to

19  make it automatic or semiautomatic, doesn't it?

20  A     No.  A semiautomatic is strictly semiautomatic.  The weapon

21  that "Rob" Williams had before he was killed was a semiautomatic

22  weapon with no full-automatic capability whatsoever.

23  Q     Okay.  We've heard about some -- some of the other agents

24  that had the automatic type.  In other words, you knew his was

25  not?

Buford - Cross (Mr. DeGeurin)                    2816

1    A    I know for a fact his was not.  We do have a weapon that

2    has a two-shot burst --

3    Q    Yeah.  Each time --

4    A    -- which will fire two rounds.

5    Q    -- you pull the trigger --

6    A    It would fire two rounds as opposed to one.

7    Q    Yeah.  Pull it three times, you get six rounds --

8    A    Yes.

9    Q    -- you know, that sort of thing, bum, bum, bum, bum, bum,

10   bum, like that?

11   A    Yes.

12   Q    Okay.  But -- but that particular one was one that did not

13   have the capabilities of firing that way?

14   A    That's correct.

15   Q    Okay.  Is -- is there -- is there another letter that goes

16   with it, an MP-5 and then a -- is there something else that

17   identifies which ones are automatic and which ones are not?

18   A    I don't believe so, no.  There is -- the selector switch on

19   the side is what identifies them as being a -- capable of a two-

20   shot burst.

21   Q    And I guess you don't know how many of the automatic ones

22   the other agents had that were not in your group?

23   A    No, I don't.

24   Q    Did the -- back to this -- I'm sorry to keep going back to

25   it, but back to this military involvement.  Is there some rule

2123

IN THE UNITED STATES DISTRICT COURT FILED

FOR THE WESTERN DISTRICT OF TEXAS NOV 28 1994

WACO DIVISION

CLERK, U.S. DIST. COURT
BY _____ DEPUTY

UNITED STATES OF AMERICA      *       CRIMINAL ACTION NO.
                               *       W-93-CR-046(2)(3)
VS.                          *       (4)(5)(6)(7)(8)(9)
                               *       (10)(11)&(12)
BRAD EUGENE BRANCH,     *
KEVIN A. WHITECLIFF,    *
CLIVE J. DOYLE,         *
JAIME CASTILLO,         *
LIVINGSTON FAGAN,      *
PAUL GORDON FATTA,     *
WOODROW KENDRICK,      *
A/K/A BOB KENDRICK,    *
NORMAN WASHINGTON ALLISON, *
A/K/A DELROY NASH,     *
GRAEME LEONARD CRADDOCK,  *       January 21, 1994
RENOS AVRAAM and       *
RUTH OTTMAN RIDDLE      *      San Antonio, Texas
* * * * * * * * * * * * * *

**BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING,**

**AND A JURY**

**APPEARANCES:**

For the Government:         Mr. W. Ray Jahn,
                         Mr. William W. Johnston,
                         Mrs. LeRoy M. Jahn,
                         Mr. John A. Phinizy and
                         Mr. John M. Lancaster
                         Assistant U.S. Attorneys
                         P.O. Box 828
                         Waco, Texas  76703

For Defendant Branch:     Mr. Douglas Tinker
                         Attorney at Law
                         622 Tancahua
                         P.O. Box 276
                         Corpus Christi, Texas  78403
                               and
                         Mr. Richard G. Ferguson
                         Attorney at Law
                         P.O. Box 1157
                         Waco, Texas  76703

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

Alexander - Redirect (Mr. Jahn)                    2197

1          <u>LOWELL SPRAGUE, GOVERNMENT WITNESS, SWORN</u>

2                    <u>DIRECT EXAMINATION</u>

3    BY MR. JAHN:

4    Q    For the record, could you state your full name and spell

5    your last name for the court reporter.

6    A    My name is Lowell Sprague, S-p-r-a-g-u-e.

7    Q    How are you employed, sir?

8    A    I'm employed as an agent for the Bureau of Alcohol, Tobacco

9    and Firearms.

10   Q    And how long have you been so employed?

11   A    Since May of 1985.

12   Q    Okay.  Prior to that date, sir, did you have any law

13   enforcement experience?

14   A    Yes, sir.  Prior to that, I was employed by the United

15   States Secret Service.

16   Q    And how long had you been employed by the United States

17   Secret Service?

18   A    Approximately one year.

19   Q    Okay.  Have you attended college?

20   A    I have.

21   Q    And where did you attend college?

22   A    I attended two years at Oklahoma State University and then

23   three years to Springfield College in Springfield,

24   Massachusetts.

25   Q    And did you get a degree?

Sprague - Direct (Mr. Jahn)                                      2210

1    Q    All right.  And what did you do, then, when you saw this,

2    what to you was evidence of being -- of gunfire?

3    A    I attempted to return fire to these three windows.

4    Q    What type of equipment did you have for that purpose?

5    A    I had an MP-5, 9-millimeter shoulder weapon.

6    Q    All right.  And you -- when you say "shoulder weapon," did

7    it have -- can you describe it for the jury?

8    A    It had a stock and it is designed and manufactured to be

9    fired from the shoulder.

10   Q    Is it a long barrel weapon or a shorter barrel weapon?

11   A    That's relative, I guess.  It's -- it's -- would be short

12   barreled for -- for a shoulder weapon, for some shoulder

13   weapons, but definitely longer than a handgun barrel.

14   Q    All right.  And insofar as this particular one, was it

15   designed to fire in an automatic fashion?

16   A    Yes, sir.  It had a select-fire switch, it was designed to

17   fire a two-round burst.

18   Q    Okay.  So, when you say a "two-round burst," what do you

19   mean by that?

20   A    I could expend two rounds, but two rounds only, with a

21   single pull of the trigger.

22   Q    Was there any way to click it onto the fully automatic and

23   completely empty a magazine all at one time?

24   A    No, sir.  The select-fire allowed me a safe position, a

25   semiautomatic position, which would be one round with a single

Sprague - Direct (Mr. Jahn)                              2211

1    pull of the trigger, and a two-round burst, and that was all.

2    Q     Were there any ATF agents that day equipped with fully

3    automatic weapons?

4    A     Not to my knowledge.  ATF does not issue fully automatic

5    weapons any more than a two-round burst weapon.

6    Q     Okay.  Not any more than two rounds?

7    A     That's correct.

8    Q     You say you attempted to return fire.  What happened?

9    A     My MP-5 malfunctioned and jammed.  I immediately dropped to

10   my knee and cleared the malfunction behind the van.

11   Q     At the time that you were behind the van and it

12   malfunctioned, who else was there?

13   A     Agent Joe Patterson was in the middle of the van, Agent

14   Mark Murray had taken up a position on the passenger side, and

15   Agent Steve Willis had taken up a position one body width

16   removed from the rear bumper behind us.

17   Q     Did you know what those agents were doing?

18   A     At that point in time, no, sir, I didn't.

19   Q     Your weapon jammed, you dropped to our knee, and what

20   happened then?

21   A     I extracted the magazine and cleared the jam, put the

22   magazine back in the weapon and attempted to fire a second time.

23   Q     All right.  And what happened then?

24   A     The weapon malfunctioned again, so I extracted and cleared

25   the weapon again and then put the magazine back in.

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

Sprague - Direct (Mr. Jahn)                                    2212

1    Q    Okay.  Were you able to finally fire your weapon that day?

2    A    Yes, sir, I was.  After I cleared the second malfunction, I

3    was able to fire.  I returned fire to the three windows that

4    I've previously pointed out.

5    Q    Okay.  The three windows you identified, is that correct?

6    A    That's correct.

7    Q    Did you -- did you fire at any other locations that day?

8    A    Yes.  I also fired to the top of the cylindrical rust-

9    colored water tower.

10   Q    All right.  Can you tell the jury why you shot up there,

11   what you saw and why you shot?

12   A    I was able to observe two individuals on the water tower.

13   Q    Okay.  And what did you see of those individuals?

14   A    One individual was up to the inner portion of the compound,

15   it appeared to me to be in this section (indicating), walking

16   around.  They were both silhouetted against the sky.

17   Q    Could you see anything associated with those individuals?

18   A    Yes.  The one that was up and walking around appeared to me

19   to be carrying a large rifle with a bipod on the front.  I

20   associated it with a weapon like the FN-FAL.

21   Q    Okay.  Could you see anything associated with the other

22   person?

23   A    The other individual was coming out of a tank-type hatch in

24   the top of the water tower.  He also had a long -- long gun,

25   because I could see the barrel of it.  It was either strapped to

FORM LASER BOND A PENGAD/INDY 1-800-631-6989

# Exhibit B

# 94-50437

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

BRAD EUGENE BRANCH, KEVIN A. WHITECLIFF,
JAIME CASTILLO, RENOS AVRAAM, PAUL GORDON FATTA,
and GRAEME LEONARD CRADDOCK,

Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

BRIEF FOR THE UNITED STATES

JAMES H. DeATLEY
United States Attorney
Western District of Texas

JOSEPH C. WYDERKO
Attorney
U.S. Department of Justice
Washington, D.C.
Phone: (202) 514-3608

weapons does not show that the agents used "excessive force."[9]
Moreover, in addition to executing an arrest warrant for Koresh,
the agents were executing a search warrant that had been issued
based on probable cause to believe that illegal firearms were
located within the compound.  TR. 1274, 1630, 3041-42; GX 1906 &
2050.  Given the size of the compound and the number of residents
believed to be inside who might have access to the illegal weapons,
the use of 76 agents to execute the warrants was hardly excessive
or unreasonable.  Indeed, Agent Gerald Petrilli testified that the
number of agents used to execute the warrants at the Mt. Carmel
compound was proportionally less than the number of agents typical-
ly used to execute warrants for smaller residences.  TR. 2344-46.

Even if there were some evidence to show that defendants
reasonably believed that the amount of force used by the ATF agents
in executing the warrants was "excessive," defendants would not be
entitled to a jury instruction on an "excessive force" theory of
self-defense unless there was also evidence showing that they used

---

[9]  The evidence at trial showed that the agents carried the
standard variety of weapons used for the execution of warrants.
TR. 1277-78, 1446-49, 1456-57, 1883-86, 1938, 2373-74, 2998-99.
All the agents carried their Sig-Sauer 9 millimeter pistols loaded
with hydroshock ammunition.  TR. 1230-36, 1278, 1536, 1619-20,
1803-04, 1845, 1938, 1993, 2049-50, 2059, 2130, 2317, 2379-80,
2399-2400, 2542, 2588, 2642, 2688, 2743-44, 2830, 2834, 2869-70,
2902, 2969, 3005-06, 3118-19.  Some agents also had .38 caliber
revolvers.  TR. 1278, 1938, 2317-18.  Several agents carried
shotguns.  TR. 1278, 2114, 2191-92, 2130, 2375-76, 2588, 3118.  Six
agents had AR-15 semiautomatic assault rifles.  TR. 1619-20, 1701,
1748, 1843-44, 1856.  Several agents had MP-5 shoulder weapons that
fired in two-round bursts and used the same ammunition as the 9
millimeter pistols.  TR. 1855-56, 1993, 2025-29, 2033-33, 2049-50,
2210-11, 2223-24, 2395, 2588-89, 2704, 2815-16, 2828-30, 3118,
3142, 3152-53.  None of the agents had fully automatic weapons.
TR. 2068, 2211, 3116, 3130, 3142, 3152-53.

<u>States</u> v. <u>Jackson</u>, 978 F.2d 903, 915 (5th Cir. 1992), cert. denied, 113 S. Ct. 2429 (1993). Accordingly, this case should be remanded to the district court with directions to vacate the restitution order. At the same time, this Court should direct the district court to reconsider its earlier ruling at sentencing that 18 U.S.C. 3681 is unconstitutional in order to provide the parties an opportunity to address that issue.

<div align="center">

**CONCLUSION**

</div>

For the foregoing reasons, the judgments of conviction and the sentences should be affirmed, but the case should be remanded to the district court with directions to vacate the restitution order.

Respectfully submitted.

JAMES H. DeATLEY
<u>United States Attorney</u>
<u>Western District of Texas</u>

<u>Joseph C Wyderko</u>

JOSEPH C. WYDERKO
<u>Attorney</u>
<u>U.S. Department of Justice</u>
<u>Washington, D.C.</u>

<div align="center">

134

</div>