```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                           EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        ) Docket No. 18 CR 522-1
                                      )
 4            Government,             )
                                      ) Chicago, Illinois
 5                vs.                 ) March 3, 2020
                                      ) 1:30 o'clock p.m.
 6   XAVIER J. TRAVIS (1),            )
                                      )
 7            Defendant.             )

 8

 9            TRANSCRIPT OF PROCEEDINGS - Sentencing
              BEFORE THE HONORABLE JOHN ROBERT BLAKEY
10

11   APPEARANCES:
     For the Government:        UNITED STATES ATTORNEY'S OFFICE
12                              BY:  MR. CHARLES W. MULANEY
                                219 South Dearborn Street
13                              Suite 500
                                Chicago, Illinois  60604
14
     For the Defendant:         FEDERAL DEFENDER PROGRAM
15                              BY:  MS. AMANDA G. PENABAD
                                55 East Monroe Street
16                              Suite 2800
                                Chicago, Illinois  60603
17
     Also Present:              U.S. PROBATION OFFICE
18                              BY:  MS. KELLY KWONG
                                230 South Dearborn Street
19                              Suite 3400
                                Chicago, Illinois  60604
20

21   Also Present:              Ms. Susan C. Igras, paralegal

22

23                   Laura LaCien, CSR, RMR, FCRR
                          Official Court Reporter
24             219 South Dearborn Street, Suite 1212
                       Chicago, Illinois  60604
25                          (312) 408-5032
```

1      (The following proceedings were had in open court:)

2           COURTROOM DEPUTY:  18 CR 522-1, USA versus Xavier

3    Travis.

4           THE COURT:  Good afternoon, everyone.  Appearances

5    please.

6           MS. PENABAD:  Good, afternoon, your Honor.  Amanda

7    Penabad from the Federal Defender Program on behalf of Xavier

8    Travis who is present before the Court.

9           MR. MULANEY:  Good afternoon.  Charles Mullaney on

10   behalf of the United States.

11          MS. KWONG:  Good afternoon, your Honor.  Kelly Kwong

12   on behalf of the Probation Office.

13          THE COURT:  And the defendant is present in custody.

14   My understanding is we're here for sentencing following the

15   change of plea on September 18th.  Are the parties ready to

16   proceed?

17          MR. MULANEY:  Yes, your Honor.

18          MS. PENABAD:  Yes, your Honor.

19          THE COURT:  All right.  Just so the parties have a

20   preview, there's obviously a series of legal objections but

21   in going through the materials, it also seems that it's not a

22   purely legal objection.  The objections were not made

23   factually paragraph by paragraph to the PSR but there's

24   enough of an overlap between the two that we have both

25   factual and legal objections, I think; and I'm happy to hear

1    something different if people think I'm not viewing it

2    correctly.

3            So what I would normally do under this certain

4    circumstance where obviously the government has the burden of

5    establishing enhancements, whether it's a determination of

6    the base offense level or enhancement to a base offense

7    level, is to take whatever testimony and evidence, which in

8    this case looks -- and again, you correct me if I'm wrong --

9    would include review of certain electronic evidence as well;

10   not just testimony or the attachments to the PSR.  Is that

11   right?

12           MR. MULANEY:  Your Honor, I have conferred with

13   defense counsel about this.  I do not believe there is an

14   actual dispute about the capacity of the MP5 firearm at issue

15   and it's the government's position that the 30-round

16   capacity, which I believe is not disputed, is dispositive of

17   defendant's base offense level and the Court need not reach

18   the alternative issue of whether it is a machine gun under

19   the statutory definition.

20           I do have Agent Dynes -- the case agent here, he

21   actually has the MP5 and its magazine, which have been

22   disabled, in the courtroom today.  We're happy to present

23   testimony and show the Court the firearm.  But the purpose of

24   his testimony in terms of resolving factual disputes would be

25   to establish that the magazine had a capacity of 30 rounds.

1    And he'll also be able to testify that this was mentioned to

2    Mr. Travis in the course of his April 15th -- I'm sorry,

3    August 15th, 2018, meeting with undercover officers and he

4    acknowledged that he knew that it had a 30-round capacity.

5           We've cited case law where defendant's knowledge is

6    not actually relevant; but if the Court wants to hear that

7    testimony, we're prepared to establish those facts.

8           THE COURT:  I understand your argument that, you

9    know, if one enhancement applies, then the other one doesn't

10   but, you know, I don't know how it's going to shake out on

11   appeal if there is an appeal.  And if you want to have an

12   alternative basis on your way upstairs, which is normally the

13   case, then absent some stipulation from the defense which I

14   have not seen in the materials, I'd simply take all the

15   evidence today on all of the objections, whether they're

16   factual or legal, including any references to, Judge, you

17   need to look at the undercover recording, in particular these

18   parts, and then I would take it under advisement, review

19   those particular matters, anything else you want to address

20   with the benefit of argument of counsel and then we could

21   conclude the sentencing after I have an opportunity to make

22   whatever factual findings.  How does that sound?

23          MR. MULANEY:  That sounds good, your Honor.

24          THE COURT:  Does that sound good with you?

25          MS. PENABAD:  Yes, your Honor.

1          THE COURT:  All right.  Sir, this is your

2    sentencing.  It's not going to -- we're not going to have all

3    of it today.  We're going to get as far as we can because

4    there's some factual and legal dispute as to some of the

5    guideline calculations, okay.  The law requires that I

6    calculate that correctly.  So if your attorney is making

7    objections, I have to make sure that I make that ruling

8    correctly.

9          At the end of the day, I am -- those guidelines are

10   not binding on me.  I have to calculate them correctly, I

11   have to consider them, but I also have to look at a variety

12   of other statutory factors about you and the case to

13   determine if a sentence under what's called 18 U.S.C. 3553,

14   which is to fashion a sentence that is greater -- sufficient

15   but not greater than necessary.  Okay?  A lot of this has to

16   do with a lot of numbers and it's a lot of math and I

17   apologize for that.  Some of those numbers are not very

18   pleasant and we'll go through all of that on our next court

19   date.

20         What we're going to do today is hear evidence and

21   argument regarding what some of these facts are and what some

22   of these guideline calculations or enhancements are, okay?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Do you have any questions for me before

25   we start?

1          THE DEFENDANT:  No.

2          THE COURT:  All right.  I'm going to have to ask you

3     a couple of questions before I hear -- start the sentencing

4     proceeding.  When I do that, I'm going to place you under

5     oath so it's important that you give me truthful and complete

6     answers to my questions because, since you're under oath, if

7     you don't, you could be subjected to additional penalties for

8     perjury or making a false statement.  Do you understand that?

9          THE DEFENDANT:  Yes.

10          THE COURT:  Raise your right hand.

11       (Defendant sworn.)

12          THE COURT:  All right.  Have you had an opportunity

13     to see the Presentence Investigation Report and the

14     sentencing materials?  You can put your hand down.

15          THE DEFENDANT:  Yes.

16          THE COURT:  Have you had enough time to discuss

17     those items and your case with your attorney?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Are you satisfied with the legal

20     representation and advice that you've received in the case?

21          THE DEFENDANT:  Yes.

22          THE COURT:  All right.  For the record, the Court

23     has considered the PSR, the attachments, the supplement, the

24     Probation Office recommendation which has been provided to

25     the parties, the government's sentencing memorandum -- that's

1    more than one -- including the response, and the defendant's

2    sentencing memorandum and mitigation report and the letters

3    in support.

4              Is there anything I haven't mentioned that the

5    parties think is part of the record for sentencing, on behalf

6    of the government?

7              MR. MULANEY:  No, your Honor.

8              THE COURT:  Other than the testimony and the

9    evidence from today.  Anything else on behalf of defense?

10             MS. PENABAD:  No, your Honor.

11             THE COURT:  All right.  Do you want to go right to

12   hearing and then we'll have argument at the end or do you

13   want to argue and then have evidence?  It's up to you.

14             MR. MULANEY:  Your Honor, I can --

15             THE COURT:  All right.  We'll start with the

16   hearing?

17             MR. MULANEY:  Yeah, I can start with the

18   testimony.

19             THE COURT:  Okay.  You can have a seat, counsel.

20   Sir.

21             MR. MULANEY:  Your Honor, the government calls ATF

22   Special Agent Joseph Dynes to the stand.

23             THE COURT:  Please raise your right hand.  Hang on a

24   second.  We have to wait.

25        (Brief pause.)

```
 1              THE COURT:  Raise your hand.
 2         (Witness sworn.)
 3              THE COURT:  All right.  Have a seat.  Could you
 4    please state your name for the record?
 5              THE WITNESS:  Joseph Dynes, D-y-n-e-s.
 6              THE COURT:  Counsel, whenever you're ready.
 7         JOSEPH DYNES, GOVERNMENT'S WITNESS, FIRST DULY SWORN
 8                        DIRECT EXAMINATION
 9    BY MR. MULANEY:
10    Q.  Good afternoon, Mr. Dynes.  Could you state for the
11    record your current job title?
12    A.  I'm a Special Agent with the Bureau of Alcohol, Tobacco
13    and Firearms.
14    Q.  And how long have you been a Special Agent?
15    A.  With the Bureau of Alcohol, Tobacco and Firearms,
16    approximately October 2014.
17    Q.  And before that, what was your position?
18    A.  I was a Special Agent with the United States Secret
19    Service since January 2010.
20    Q.  And in your current duties as a Special Agent for ATF,
21    what are your job duties?
22    A.  To conduct investigations related to violent crime and
23    the illegal possession, use, and transfer of firearms.
24    Q.  Okay.  Can you raise the microphone just a little?
25    A.  Sorry.  Is that better?
```

1   Q.  Yes.  And were you the case agent on the -- this current

2   case, *United States versus Xavier Travis*?

3   A.  One of the case agents, yes.

4   Q.  Okay.

5           MR. MULANEY:  Your Honor, I'd like to approach with

6   two exhibits that had been marked Government Exhibit MP5 and

7   Government Exhibit Magazine and --

8           THE COURT:  You may approach.  It's Government

9   Exhibit MP5 and Government Exhibit Magazine.  Go ahead.

10  BY MR. MULANEY:

11  Q.  Okay.  Agent Dynes, I've just handed you two boxes with a

12  firearm attached to it and that box is labeled Government

13  Exhibit MP5 and then another box with a magazine attached to

14  it labeled Government Exhibit Magazine.  Is this the firearm

15  and magazine that was shown to the defendant in the course of

16  this investigation?

17  A.  Yes.

18  Q.  And was this firearm and magazine shown to the defendant

19  on August 15th, 2018, by undercover officers?

20  A.  Yes.

21  Q.  And can you just describe generally, what was the purpose

22  of that meeting?

23  A.  The purpose of that meeting was to trade narcotics for a

24  purported stolen TV as well as do some street-theater flash

25  firearms to Mr. Travis as a show of what the undercover

1  agents were able to produce.

2  Q.  Okay.  And before this date, the undercover officers had

3  had interaction with Mr. Travis before; is that correct?

4  A.  Yes.

5  Q.  Okay.  And do they talk about selling him other stolen

6  contraband in general aside from firearms?

7  A.  Yes.

8  Q.  And could you -- what was some of the contraband they

9  discussed?

10  A.  TVs, vehicles.

11  Q.  Now in this August 15th, 2018, meeting, did the defendant

12  express an interest in the firearm that is sitting in front

13  of you?

14  A.  Yes.

15  Q.  And can you explain what type of firearm that is?

16  A.  The firearm is an MP5, 9 millimeter machine gun.

17  Q.  Okay.  And at the time of this meeting in August 15th,

18  was the firearm in a fully automatic mode?

19  A.  At the current state, it operated as a semi-automatic

20  firearm.

21  Q.  And did one of the undercover officers refer to the

22  capacity of the magazine of the MP5 during that

23  conversation?

24  A.  Yes.  He described it as a 30 rounder.

25  Q.  Okay.  And how did that come up of the undercover officer

1    describing anything?

2    A.   It was during part of the conversation where Mr. Travis

3    stated that he had no need for 30-shot clips, referring to a

4    30-round magazine.  Through that conversation, Mr. Travis

5    specified that he did not need 30-round magazines for

6    handguns and then also stated to the effect of that if you

7    have a 30-round -- if you shoot 30 rounds before the police

8    show up without hitting your target, then you have bad aim.

9    The undercover officer then responded saying that --

10   something to the effect of the MP5 is a 30 rounder.

11   Mr. Travis responded with I know.

12   Q.   All right.  And after this August 15th meeting, was there

13   further communications -- well, sorry.  Back up.  Did

14   Mr. Travis actually purchase or walk away with firearms on

15   that August 15th day?

16   A.   No.

17   Q.   After that August 15th date, was there further

18   communication between Mr. Travis and the undercover officers

19   about purchasing firearms?

20   A.   Yes.

21   Q.   Okay.  And was Mr. Travis offered a variety of firearms

22   to purchase through text message and phone calls?

23   A.   Yes.

24   Q.   And aside from the MP5, can you describe what he was

25   offered?

1   A.  He was offered an AK-style rifle, two revolvers.  One

2   purported to be one that the undercovers were keeping as well

3   as three other semi-automatic handguns.

4   Q.  Okay.  And were you also a part of the operation on the

5   night of defendant's arrest on August 27th, 2018?

6   A.  Yes.

7   Q.  Okay.  And did the defendant again express an interest in

8   buying that particular MP5 firearm that you have sitting in

9   front of you in that meeting?

10  A.  Yes.

11  Q.  Okay.  And just for the record, are you referring to the

12  capacity of the MP5 magazine in reference to the August 15th,

13  2018, meeting?  What is the capacity of the magazine for the

14  MP5 firearm?

15  A.  It's -- the capacity is 30 rounds of ammunition.

16  Q.  Okay.  And have you actually verified that by loading

17  dummy bullets into the magazine or some other type of

18  round?

19  A.  I verified by live 9 millimeter ammunition, 30 rounds.

20  Q.  All right.  And then in that meeting, was Mr. Travis also

21  presented with handguns that he could purchase?

22  A.  Yes.

23  Q.  And was -- did he identify two handguns in particular

24  that he was interested in buying?

25  A.  Yes.

1  Q.  Okay.  And was he quoted prices for the MP5 and the two

2  handguns that he was interested in?

3  A.  He was.

4  Q.  All right.  And did the undercover officers that were

5  purportedly selling the guns, did they discuss how the guns

6  could be purchased?  Did they give Mr. Travis options?

7  A.  Yes.

8  Q.  And what options did they give him?

9  A.  Purchase the firearms in cash or some sort of trade of

10  cocaine or other narcotics and cash or just narcotics.

11  Basically, it was cash, narcotics and cash, or just

12  narcotics.

13  Q.  And what did Mr. Travis opt for?

14  A.  To trade 30 grams -- approximately 30 grams of cocaine

15  for the firearms.

16  Q.  Okay.  All right.  And did Mr. -- was Mr. Travis

17  arrested -- I'm sorry.  Did Mr. Travis actually leave the

18  warehouse to obtain that cocaine?

19  A.  Yes.

20  Q.  And did he come back with a substance that later tested

21  positive for cocaine?

22  A.  Yes.

23  Q.  And did he complete the exchange with the undercover

24  officers?

25  A.  Yes.

1    Q.  And was he -- was he handed over the firearm that's

2    sitting in front of you?

3    A.  One of -- yes.  This was one of the firearms that he took

4    custody of.

5    Q.  As well as the two other handguns that you referred to

6    earlier?

7    A.  Yes.

8    Q.  And can you remind the Court what those two firearms

9    are?

10   A.  It was a Colt revolver and a Glock semi-automatic

11   pistol.

12   Q.  And was the defendant arrested as he was attempting to

13   exit the warehouse on that night?

14   A.  Yes.

15   Q.  Okay.  In the course of this investigation, did you

16   review a report by the Firearms Technology Branch of the

17   ATF?

18   A.  Yes.

19   Q.  And was it a report of technical examination from 2012?

20   A.  Yes.

21   Q.  Okay.  Did you obtain this report before or after that

22   August 27th arrest we just discussed?

23   A.  After.

24   Q.  And that -- and I'm talking about you personally --

25   A.  Yes.

**Dynes - Direct by Mr. Mulaney**

1    Q.   -- rather than the ATF?

2    A.   Yes.  Well, me personally.  The report was obviously

3    generated prior to the deal but we did not receive a copy of

4    the report until after the transaction on August 27th.

5    Q.   Okay.  And you've reviewed that report before coming here

6    today?

7    A.   Yes.

8    Q.   And is there a reference in the report that the examiner,

9    to demonstrate the functionality of the firearm, obtained an

10   MP5 machine gun trigger group from another MP5 machine gun

11   that the ATF had in its possession?

12   A.   In the report, the examiner described that he removed the

13   trigger group from the MP5 that Mr. Travis took custody of

14   with a trigger group from a machine gun that the Firearm's

15   Technology Branch of the ATF had in their possession.

16   Q.   Okay.  And could you just hold up Government Exhibit MP5

17   and show the Court what that refers to when you say "trigger

18   group"?

19   A.   So the trigger group (indicating), and it's also depicted

20   in the report.  There's photographs of the examiner removing

21   basically this lower portion -- it almost feels like

22   plastic -- and the top portion.  Basically removing it from

23   the top portion.  So it's just this little rectangle along

24   with the grip that was removed.

25   Q.   Okay.  And did the examiner confirm that the firearm

**Dynes - Direct by Mr. Mulaney**                                    16

1    could shoot in fully automatic mode once he installed a fully

2    automatic trigger group?

3    A.  Yes.

4    Q.  And, Agent Dynes, in the course of your duties, do you --

5    are you involved in using and examining multiple different

6    types of firearms?

7    A.  Yes.

8    Q.  Does that include many semi-automatic firearms?

9    A.  Yes.

10   Q.  Okay.  Can any semi-automatic firearm be converted to a

11   fully automatic machine gun?

12   A.  Not easily.  Some semi-automatic guns can be converted to

13   machine guns, yes.  It just depends on the type and the

14   brand --

15   Q.  Right.

16   A.  -- of how simple it is or not simple.

17   Q.  Right.  But not -- can every semi-automatic weapon be

18   converted to fully automatic?

19   A.  In theory, yes.

20   Q.  Okay.  And how would that be done?

21   A.  By grinding down a sear that catches the firearm from

22   shooting more than one round of ammunition per trigger pull

23   to basically grinding down or removing that sear to be able

24   to -- so it won't be catching the bolt which would then in

25   effect make it a machine gun.

**Dynes - Direct by Mr. Mulaney**

1  Q.   Okay.  And according to the technical report, how -- what

2  was the MP5 originally manufactured as?

3  A.   As a machine gun.

4  Q.   Okay.

5          MR. MULANEY:  No further questions.

6          THE COURT:  Are you moving Government Exhibit MP5

7  and Government Exhibit Magazine into evidence?

8          MR. MULANEY:  Yes, your Honor.  For the -- we would

9  move it into evidence for the purposes of this hearing.

10         THE COURT:  All right.  Officer, the August 15th

11  meet, was that recorded?

12         THE WITNESS:  Yes, sir.

13         THE COURT:  Do you intend to offer any recordings or

14  transcripts into evidence?

15         MR. MULANEY:  Your Honor, I have the recording here

16  if you'd like to hear it.  We could hook it up to the

17  courtroom sound system.  I do know defense counsel has it as

18  well.  I just was not sure if she was going to challenge the

19  testimony on the specific conversation that he just testified

20  to.

21         THE COURT:  Well, it's your burden.  There's a

22  difference between a characterization of a conversation and

23  an actual conversation.  Do you want me to hear the actual

24  conversation?

25         MR. MULANEY:  Yes, I do.

1      THE COURT:  You don't have to -- you don't have to

2  publish it.  There's no jury.  As long as you lay a

3  foundation for it and move it into evidence, then I'm happy

4  to see if there's an objection.  Obviously, it's not trial

5  admissibility, it's sentencing admissibility; and then I can

6  review it prior to our next court date.  It's up to you.

7  What do you want to do?

8      MR. MULANEY:  Yes, your Honor.  I can -- if you'd

9  like me to play it in court and also tender the disk because

10  we are continuing the sentencing, I'm happy to do that.

11      THE COURT:  Well, why don't -- is there any

12  objection to the admission of the recording?

13      MS. PENABAD:  There is no objection, your Honor.

14      THE COURT:  All right.  Why don't you just submit

15  the -- a disk to chambers as soon as you can, maybe at the

16  end of the day.  And if you have a transcript, great.  If you

17  don't, I'll muddle along without one so the -- what do you

18  want to designate that as exhibit, Government Exhibit, what,

19  Recording?

20      MR. MULANEY:  Yeah.  Government Exhibit Recording is

21  fine.

22      THE COURT:  Government Exhibit Recording with

23  transcript, if there is one available.  If not, that's fine.

24  That will be admitted without objection.

25    (Government Exhibit Recording with transcript admitted

**Dynes - Direct by Mr. Mulaney**

1   into evidence.)

2         THE COURT:  Any objection to the admission of MP5 or

3   Government Exhibit Magazine?

4         MS. PENABAD:  No objection.

5         THE COURT:  All right.  Those will both be

6   admitted.

7      (Government Exhibit MP5 and Government Exhibit Magazine

8   admitted into evidence.)

9         THE COURT:  Can you hand them over?  I'm going to

10  look at them now and I'm going to hand them back to you.

11     (Brief pause.)

12        MR. MULANEY:  And, your Honor, with regard to the --

13        THE COURT:  Hold on a second.  One second, counsel.

14     (Brief pause.)

15        THE COURT:  Okay.  The Court has reviewed those two

16  exhibits.  They will remain in the custody of the agent.

17  Yes, counsel.  Go ahead.

18        MR. MULANEY:  With regard to the August 15th

19  recording, we don't have a verbatim transcript.  We do have a

20  report of the event which is currently not in the sentencing

21  records.  We can submit that with the disk if you would

22  like.

23        THE COURT:  All right.  Has defense counsel seen it?

24        MR. MULANEY:  Yes.

25        THE COURT:  Okay.  Can you identify with specificity

1    what report you're talking about?

2           MR. MULANEY:  Oh, it's the August 15th, 2018,

3    report.  It's incorporated by the ATF but it's a report by

4    the Illinois State Police that details the --

5           THE COURT:  All right.  Do you have a copy of it?

6           MR. MULANEY:  Yes.  One moment, your Honor.  Excuse

7    me.

8        (Brief pause.)

9           THE COURT:  Sure.  While you're looking for that,

10   Agent, there was another conversation.  I believe it -- was

11   it August 18th?

12          THE WITNESS:  Oh.  Referring to --

13          THE COURT:  Because the -- he wasn't arrested on the

14   15th, correct?

15          THE WITNESS:  No.

16          THE COURT:  Okay.

17          THE WITNESS:  He was arrested on August 27th.

18          THE COURT:  27th.  Was there -- how many meetings or

19   conversations between the 15th and the date of arrest?

20          THE WITNESS:  There were multiple conversations via

21   phone and text messages between an undercover agent and

22   Mr. Travis.

23          THE COURT:  Okay.  And they were recorded?

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Okay.  Does the government intend to

1    rely on the substance of any of those conversations or

2    meetings, whether they be in person or electronic or

3    otherwise, as part of the record for sentencing?

4              MR. MULANEY:  Yes.  The government included in its

5    attachment to the government's version of the offense the

6    report for the August 27th, 2018, meeting and that's also --

7    it's also included in the complaint in this matter.

8              THE COURT:  Okay.

9              MR. MULANEY:  We have a recording of that as well.

10             THE COURT:  For purposes of sentencing, you have to

11   identify what you want me to look at to make findings of fact

12   so go ahead and make whatever record you want.  If you don't

13   identify it, I'm not going to rely on it so it's up to you.

14             MR. MULANEY:  Your Honor, with regard to the August

15   15th, 2018, report which was not as part of the government's

16   version -- it actually is an ATF report.  I'm showing it to

17   defense counsel now.

18             THE COURT:  Okay.

19             MR. MULANEY:  I can tender this to the Court with

20   the recording if -- assuming that there's no objection --

21             THE COURT:  All right.

22             MR. MULANEY:  -- to the government's version.

23             THE COURT:  Any objection to the admission of

24   Government Exhibit August 15th, report?

25             MS. PENABAD:  No objection.

1      THE COURT:  All right.  That will be admitted with

2   sentencing.

3      (Government Exhibit August 15 Report admitted into

4   evidence.)

5      THE COURT:  Go ahead and submit a clean copy of that

6   to chambers when you submit the recording for the August

7   15th.

8      Is there anything other than what's -- the

9   attachments to the government and the government version that

10  you intend to rely on for sentencing?

11      MR. MULANEY:  Nothing that's not already in the

12  record through the government's version of the offense or

13  exhibits that we filed in this matter --

14      THE COURT:  All right.

15      MR. MULANEY:  -- on the record.

16      THE COURT:  Exhibits on file, I don't know what that

17  means, counsel.  You need to point to me what you're relying

18  on.  The government's version is attached to the PSR.  The

19  PSR is part of the record for sentencing.  If there's some

20  other thing that you're talking about, then you need to

21  identify it, move it into evidence and then I can see if

22  there's an objection and then we have a clean record about

23  what I'm basing any factual findings on.

24      So is there any other recordings because right now

25  you only have one in evidence?

1          MR. MULANEY:  Actual recordings?

2          THE COURT:  Yeah.

3          MR. MULANEY:  We can -- I can supplement the record

4    with the video recording showing the defendant handling the

5    firearm that's pictured in the government's --

6          THE COURT:  It's up to you, counsel.  It's your

7    burden.  You do whatever you want.  I'm just trying to figure

8    out what you're doing so you tell me what evidence you're

9    moving into evidence before you pass this witness.  What

10   other evidence do you want to admit?

11         MR. MULANEY:  Okay.  Your Honor, I cited a number of

12   things in the -- in my sentencing memorandum.  I'll start

13   with the criminal complaint in this matter, the affidavit

14   that's cited in the government's version of the offense, and

15   the sentencing memo.

16         The government's version of the offense, as I

17   mentioned, includes attached to it the August 27th, 2018, ATF

18   report that summarizes that meeting which is --

19         THE COURT:  All right.  So the government has moved

20   into evidence the complaint and affidavit, obviously a

21   sentencing memorandum -- there's a proffer there that's part

22   of the record for sentencing -- the government's version,

23   which is part of the -- attached to the PSR as part of the

24   record for sentencing, and that includes its attachments

25   which include the August 27th report.

1           Anything else the government is moving into evidence

2     or part of the record for sentencing?

3           MR. MULANEY:  The government attached to its

4     response to defendant's sentencing memorandum as Exhibit A

5     the ATF Firearms Technology Branch Report of Technical

6     Examination that I just referred to in the Agent's

7     testimony.

8           THE COURT:  All right.  The tech report is also part

9     of the record for sentencing.  Anything else?

10          MR. MULANEY:  And I filed a supplement to the record

11    that has a Joliet police arrest report for Mr. Travis.

12    That's the supplement I filed on Friday.  It was an arrest

13    report.  And a transcript from the Circuit Court of Will

14    County memorializing that that case was dismissed by the

15    government after a suppression hearing.

16          THE COURT:  Okay.  Those matters are part of the

17    record for sentencing.  Anything else?

18          MR. MULANEY:  I believe that covers it, your

19    Honor.

20          THE COURT:  Okay.  Great.  Any objections to the --

21    what's been admitted into evidence, counsel?

22          MS. PENABAD:  No, Judge.

23          THE COURT:  Okay, great.  Cross examination?

24          MS. PENABAD:  Thank you, your Honor.

25                         CROSS EXAMINATION

1    BY MS. PENABAD:

2    Q.   Good afternoon, Agent Dynes.

3    A.   Good afternoon.

4    Q.   Agent Dynes, you testified that you were one of the case

5    agents in this case?

6    A.   Yes, ma'am.

7    Q.   And you've reviewed the video from August 15th?

8    A.   Yes, ma'am.

9    Q.   And from August 27th?

10   A.   Yes.

11   Q.   And you reviewed the ATF reports generated in this

12   case?

13   A.   Yes.

14   Q.   And you testified before the grand jury; is that right?

15   A.   Yes, ma'am.

16   Q.   Okay.  And is it true that in the recording of the August

17   15th, 2008, (sic) meeting when agents first presented the MP5

18   to Mr. Travis, Mr. Travis made statements along the lines of

19   what is this?

20   A.   Yes.

21   Q.   He didn't know what kind of gun it was?

22   A.   That's correct.

23   Q.   And agents responded that it was a nine?

24   A.   "A nine" meaning 9 millimeter.

25   Q.   And that it shot like a BB gun; is that correct?

1  A.  Yes, ma'am.

2  Q.  And, in fact, that weapon could not shoot automatically

3  at the time Mr. Travis handled it; is that right?

4  A.  Correct.

5  Q.  And the trigger had two options?

6  A.  Yes.

7  Q.  It had a safe position and it had semi-automatic fire?

8  A.  Yes.

9  Q.  There was no third option for fully automatic fire?

10  A.  Correct.

11  Q.  Okay.  And at the time, it could not shoot fully

12  automatically?

13  A.  Correct.

14  Q.  And agents made statements along those lines to

15  Mr. Travis?

16  A.  Yes.

17  Q.  They said that the -- they could get a weapon that was

18  semi-automatic?

19  A.  Yes.

20  Q.  Or they could get a weapon that was fully automatic?

21  A.  Yes, ma'am.

22  Q.  And they illustrated the difference between those two

23  weapons, correct?

24  A.  Yes.

25  Q.  They made a sound of multiple shots being fired when they

1  talked about the fully automatic weapon?

2  A.  Yep.

3  Q.  And then they specifically said that a firearm like this

4  shot once with each trigger pull; is that right?

5  A.  Yes, ma'am.

6  Q.  Okay.  And when the -- at the time that the ATF report

7  regarding the MP5 was generated, the agent had to rely on the

8  ATF story, is that right?

9  A.  I'm sorry?

10 Q.  I'll clarify.  In order to make the weapon fire

11 automatically, the agent had to make some changes?

12 A.  The law enforcement specialist had to make a change to

13 the trigger group; yes.

14 Q.  The agent had to go out and get a different trigger

15 group?

16 A.  Yes, the law enforcement specialist.

17 Q.  I'm sorry.

18 A.  That's okay.

19 Q.  The law enforcement specialist had to get a different

20 trigger group?

21 A.  Yes, ma'am.

22 Q.  That trigger group was not in Mr. Travis' possession on

23 the date of his arrest?

24 A.  It was not.

25 Q.  It was not on the 15th?

1   A.  It was not.

2   Q.  There was no fully automatic trigger group anywhere in

3   the vicinity of that weapon on the 15th?

4   A.  There was not.

5   Q.  Or on the date of the arrest?

6   A.  Correct.

7   Q.  It was only when the law enforcement specialist retrieved

8   a special trigger that the weapon was able to fire auto --

9   fully automatically?

10  A.  The trigger group; yes.

11  Q.  Excuse me.

12  A.  That's okay.

13  Q.  Thank you.  And, Agent Dynes, an MP5 can accommodate a

14  15-round magazine; is that right?

15  A.  It can, yes.

16  Q.  And it can accommodate a 30-round magazine?

17  A.  Yes, ma'am.

18  Q.  And a 15-round magazine is not a high-capacity magazine

19  under federal guidelines?

20  A.  Correct.

21  Q.  And a 15-round magazine is also a curved magazine; is

22  that right?

23  A.  It's going to depend on the style.

24  Q.  Okay.  A 15-round magazine can be a curved magazine?

25  A.  Sure.  It could have a curve to it, yes.

1   Q.   And it attaches to the MP5 in the same place that the

2   30-round does?

3   A.   Yes, ma'am.

4   Q.   And it's the same color?

5   A.   Again, it depends on the magazine.

6   Q.   It can be the same color?

7   A.   Yes.

8   Q.   And I believe you testified that you listened to the

9   August 15th conversation?

10  A.   Yes.

11  Q.   And your testimony was that the agent said something

12  along the lines of the MP5 has a 30-round?

13  A.   It is a 30 round.  MP5 is a 30-rounder.

14  Q.   And isn't it true that what the agent said is I don't

15  think the MP5 has a 30-round?

16  A.   He -- prior to that statement, the agent stated "I don't

17  know" and in relation to what Mr. Travis was stating before

18  that and then responded "the MP5 is a 30-rounder."

19          MS. PENABAD:  Your Honor --

20          THE WITNESS:  There's a bit of a pause in that.

21          MS. PENABAD:  With your permission, I'd like to play

22  that portion of the video that's already in evidence.

23          THE COURT:  The video?

24          MS. PENABAD:  It will be the audio.

25          THE COURT:  Video/audio?

1          MS. PENABAD:  Yes.

2          THE COURT:  Okay.

3          MS. PENABAD:  I'm going to ask that video -- that

4    recording be played at about 7:50.

5          THE COURT:  Hey, Gloria, is it set for the -- did

6    we -- did they work this out with you in advance?

7          COURTROOM DEPUTY:  I'm not sure if they contacted

8    Systems.

9          THE COURT:  Okay.  Contact Systems?

10         MS. IGRAS:  I sent an email earlier.

11         THE COURT:  To who -- or whom?

12         MS. IGRAS:  I'm sorry.  I sent one to the courtroom

13   deputy --

14         THE COURT:  That's Gloria right there (indicating).

15         MS. IGRAS:  Yes.  I sent -- I left a voicemail for

16   you earlier letting you know we were going to be doing

17   this.

18         COURTROOM DEPUTY:  Did you contact Systems?

19         MS. IGRAS:  I have not had to do that before for

20   other courtrooms.

21         THE COURT:  All right.  Well --

22         MS. IGRAS:  Your Honor, I can --

23         MS. PENABAD:  Sure.  I can --

24         THE COURT:  Let's cut to the chase.  Is it on your

25   laptop?

1          MS. PENABAD:  It is.

2          THE COURT:  Okay.  Do you want to -- I just got to

3    figure out where you're plugged in and then I can queue it

4    up.  What's the source?  The Defense One, right, Gloria?

5          MS. PENABAD:  Your Honor, it is the same exhibit

6    that the government tendered -- designated and tendered.

7          THE COURT:  It just switched over to here.  Is that

8    the right one?

9          MS. PENABAD:  That is.

10         THE COURT:  Okay.  Fire away.

11         MS. PENABAD:  Thank you.

12      (Video/Audio played.)

13         THE COURT:  All right.  Can you play that again

14   because I didn't hear that?

15         MS. PENABAD:  Sure.

16         THE COURT:  Turn it up, please.  And could you note

17   for the record where we are in the counter at the bottom so I

18   can find this later?

19         MS. PENABAD:  Yes, your Honor.  It's going to be

20   played at 7 minutes and 50 seconds.

21         THE COURT:  Okay.  Turn it up all the way.

22         MS. IGRAS:  Yes.  My commuter is turned up all the

23   way.

24         THE COURT:  Okay.  Go ahead.

25      (Video/Audio played.)

1         THE COURT:  Okay.  Go ahead, counsel.

2   BY MS. PENABAD:

3   Q.  Okay.  And, Agent Dynes, you reviewed the reports in this

4   matter, correct?

5   A.  Yes, ma'am.

6   Q.  And in none of the reports is there mention of a 30-round

7   magazine, correct?

8   A.  The report related to the August 15th, 2008, (sic)

9   transaction or meeting.  At the bottom of the report

10  references photographs where the 30-round magazine is

11  depicted.

12  Q.  There are photographs, correct?

13  A.  Yes, ma'am.

14  Q.  Was there any -- any documentation about the capacity of

15  that magazine being 30 rounds?

16  A.  No.

17  Q.  And you testified before the grand jury; is that right?

18  A.  Yes, ma'am.

19  Q.  And at no point in your testimony did you indicate the

20  number of rounds, correct?

21  A.  Correct.

22  Q.  And, Agent Dynes, you've been a Special Agent for over

23  five years, correct?

24  A.  Yes, ma'am.

25  Q.  And you've participated in multiple firearms

1    investigations?

2    A.  Yes, ma'am.

3    Q.  You have seen firearm sentencings?

4    A.  Yes, ma'am.

5    Q.  And you're aware of the increased penalties for machine

6    guns?

7    A.  Not specifically.

8    Q.  You're aware of the increased penalties for

9    large-capacity magazines?

10   A.  Again, not the specifics.

11   Q.  You understand that those are important facts for the

12   Court?

13   A.  Yes, ma'am.

14   Q.  Okay.

15          MS. PENABAD:  Nothing further, your Honor.

16          THE COURT:  Any redirect?

17          MR. MULANEY:  Just briefly, your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. MULANEY:

20   Q.  Agent Dynes, I'd like to --

21          MR. MULANEY:  Your Honor, I'd like permission to

22   approach and show Agent Dynes what's been previously marked

23   as Grand Jury Exhibits 1, 2, 3, and 4; and these have been

24   tendered to the defense.

25          THE COURT:  Grand Jury Exhibits 1, 2, 3, and 4.  You

1   may approach.

2   BY MR. MULANEY:

3   Q.  Agent Dynes, I'm handing you what's been marked

4   previously as Grand Jury Exhibits 1, 2, 3, and 4.  Can you

5   describe what those exhibits are?

6   A.  Exhibit 1 is a photograph of the MP5 with the 30-round

7   magazine.

8   Q.  And what's Exhibit 2?

9   A.  Exhibit 2 is the Glock 22 that was part of the

10  transaction on August -- on August 27th, 2018.

11  Q.  And what's Exhibit 3?

12  A.  Exhibit 3 is the Colt Python revolver.  Again, that was

13  part of the transaction on August 27th, 2018.

14  Q.  And what's Exhibit 4?

15  A.  Exhibit 4 is a photograph of inside the container that

16  was provided to Mr. Travis of the MP5, the 30-round magazine,

17  the Colt Python revolver and the Glock semi-automatic

18  pistol.

19  Q.  Do you know -- do you recall the capacity of the Glock

20  clip, I'm sorry, the Glock magazine that -- with regard to

21  the Glock sold to Mr. Travis on that date?

22  A.  I do not.

23  Q.  Okay.  Is it less than 30 rounds?

24  A.  Yes.

25  Q.  Okay.  Does that picture show the -- Grand Jury Exhibit

1  4, does it show the various handguns at issue all in the same

2  photos, you can see their size and the proportion to each

3  other including the magazine of the MP5?

4  A.  Yes.

5  Q.  Okay.

6        MR. MULANEY:  Your Honor, the government would move

7  to admit Grand Jury Exhibits 1 through 4 into evidence to

8  supplement the record.

9        THE COURT:  Any objection to the admission of

10 Government Exhibit 1, 2, 3, and 4 for the purposes of

11 sentencing?

12       MS. PENABAD:  No objection.

13       THE COURT:  All right.  They'll be admitted.

14    (Government Grand Jury Exhibits 1, 2, 3, and 4 admitted

15 into evidence.)

16       THE COURT:  Can you pass them over here?

17 BY MR. MULANEY:

18 Q.  Agent Dynes, another question.  The defense asked you a

19 question about the selection of the MP5 and the impact it

20 would have on defendant's Sentencing Guidelines or potential

21 sentence.  Do you remember that?

22 A.  Yes.

23 Q.  Okay.  At the time of this investigation, were you

24 personally aware of how the capacity size of the MP5 -- MP5

25 magazine would impact defendant's sentence?

1  A.  I knew it would have an impact but did not know the exact

2  impact.

3  Q.  I'm sorry.  Say it again.

4  A.  Yes.  I knew there would be an impact but not the exact

5  impact.

6  Q.  Okay.  And that would -- you knew that would depend on

7  the charges that the defendant charged -- that the government

8  charged in this case; is that correct?

9  A.  I believed it would be dependent on what was chosen to be

10 charged and presented to the grand jury.

11 Q.  Okay.  And were you aware at the time of the

12 investigation that the MP5 had been originally manufactured

13 as a machine gun?

14 A.  No.  I did not.

15 Q.  And when I say "the investigation," I'm referring to the

16 August 15th and August 27th, 2018, dates that we discussed

17 previously.

18 A.  Correct.  We didn't realize that the MP5 was a machine

19 gun until we were provided the report in September of 2018.

20          MR. MULANEY:  No further questions.

21          THE COURT:  Any further cross?

22          MS. PENABAD:  Nothing further.

23          THE COURT:  Okay.  Thank you, sir.  You may step

24 down.

25          THE WITNESS:  Thank you.

1        (Witness excused.)

2              THE COURT:  Counsel, do you want to keep these or do

3   you want me to keep them?

4              MR. MULANEY:  Your Honor, I have electronic copies

5   so the Court can keep them.

6              THE COURT:  All right.  I'll keep them with my

7   stuff.  Thank you very much.  Any additional testimony and

8   evidence from the government?

9              MR. MULANEY:  Can I have one moment, your Honor?

10             THE COURT:  Yeah.  Take your time.

11       (Brief pause.)

12             MR. MULANEY:  No further exhibits, your Honor.

13             THE COURT:  Okay.  Defense has no burden but you

14   have the option of presenting evidence if you want to.  Any

15   evidence on behalf of the defense?

16             MS. PENABAD:  No, your Honor.  Beyond what the

17   government has tendered in terms of the 15th video and the

18   27th video, we do not have anything further.

19             THE COURT:  All right.  That concludes the evidence.

20   The record is clear at this point.  Do the parties want to

21   argue the defendant's objections to the enhancements?  Here

22   it would include high-capacity issue which results in a

23   six-level increase to the base offense level, the machine gun

24   issue which is a six-level increase to the base offense

25   level, also the knowledge as to both of those which is a

1　　six-level.  And then is there -- there's still an objection

2　　also for the four-level enhancement for the gun in connection

3　　with another offense as well?

4　　　　　　MS. PENABAD:  That's correct, your Honor.

5　　　　　　THE COURT:  Okay.  So any objections to the

6　　calculation other than those four?

7　　　　　　MS. PENABAD:  No.

8　　　　　　THE COURT:  Okay.  Go ahead, counsel.  It's defense

9　　objection.  Do you want to start or the government's burden

10　　so it doesn't matter who goes first.  Everyone is going to

11　　have a chance to talk.  Do you want to go first, counsel?

12　　　　　　MR. MULANEY:  Whatever the Court would like.

13　　　　　　THE COURT:  Yeah.  Why don't you go first, make sure

14　　cover everything, and then we'll take it under advisement and

15　　set a date for the completion of sentencing.

16　　　　　　MR. MULANEY:  Okay.

17　　　(Brief pause.)

18　　　　　　THE COURT:  Whenever you're ready, counsel.

19　　　　　　MR. MULANEY:  Your Honor, with regard to the

20　　defendant's base level offense based on the fact that the

21　　firearm is a semi-automatic capable of carrying a

22　　high-capacity magazine, I believe both parties agree that the

23　　issue is whether the magazine that was attached to it and

24　　provided with it had more than 15 rounds and the testimony

25　　you heard today was that it did, in fact, have 30 rounds.

1   That was discussed with Mr. Travis.  Even if it weren't

2   discussed with Mr. Travis, the government in its response to

3   defendant's sentencing memorandum has set forth the Seventh

4   Circuit case law which states that the defendant's knowledge

5   of the capacity of the magazine is irrelevant and the Seventh

6   Circuit compared this to the enhancement for a stolen firearm

7   in which the government does not have to prove actual

8   knowledge that the firearm was stolen.

9          With regard to the second prong, the statutory

10  definition is that the firearm must have been originally

11  manufactured as a machine gun and the ATF report that we

12  tendered into evidence is -- establishes that it was

13  originally manufactured as a machine gun, it was capable of

14  being converted back into a fully automatic mode, and the

15  Seventh Circuit has recognized that's the definition of a

16  machine gun.

17         The Second Circuit in the *Gravel* case summarized the

18  case law on that under very similar circumstances and the

19  documentation that the firearm could be converted back to

20  fully automatic mode provides an alternative bases -- basis

21  for the defendant's offense level but the -- in the most

22  simple way, the capacity of the magazine, which was the

23  government's original position under the government's version

24  of the offense, determines this issue and it is dispositive.

25  Because it had a 30-round magazine, that is conclusive as to

1  defendant's base offense level because there are alternative

2  ways.  There is no disputing that he was a prohibited person

3  at the time of the offense under Sentencing Guideline

4  2K2.1(a)(3)(A)(1).

5          With regard to the defendant's possession of the

6  firearm in connection with a felony offense, the government

7  provided case law from the Seventh Circuit both in 924(c)

8  context where trading drugs for a firearm is considered

9  possession of a firearm in furtherance of drug trafficking

10 and it cited the *United States versus Schmitt* case, the

11 Seventh Circuit case, which concluded that -- in that case

12 where the defendant had traded drugs for the gun he had in

13 his possession just a day or two before a search warrant,

14 that that was enough to satisfy the enhancement for

15 possession of the firearm in connection with a felony

16 offense.

17         The *Gates* case that the defense cites is not on

18 point because the purchaser was offered a gun as

19 collateral -- the purchaser offered a gun to the seller as

20 collateral for the purchase of synthetic marijuana.  The

21 Seventh Circuit noted that that wasn't even determined to be

22 a controlled substance so it didn't satisfy the other felony

23 offense requirement.  And the drug dealer in that case sold

24 the gun later on but he didn't provide any drugs to the

25 purchaser of the gun until afterwards and that was as a gift.

1    So I believe the facts of those cases are distinguishable and

2    *Schmitt* is almost directly on point as well as the case law

3    it relies on in the 924(c) context.

4         So I believe on both of those guidelines disputes,

5    the Seventh Circuit has provided definitive guidance on the

6    issue of defendant doesn't have to have actual knowledge of

7    the capacity of the magazine and that here a trade of drugs

8    for guns is possession of a firearm in connection with

9    another felony offense.

10        THE COURT:  Is it the government's position that any

11   semiautomatic is -- meets the definition of a machine gun

12   because you could file it down?

13        MR. MULANEY:  No, your Honor; and the agent

14   described that alternative way which is a more difficult way

15   of converting a semi-automatic firearm.  The statutory

16   definition speaks to a firearm that was originally

17   manufactured as a firearm or is capable to be converted in a

18   way that the agent explained where you can simply replace the

19   trigger group.

20        THE COURT:  All right.  So when you're talking about

21   statutory construction of the particular guideline section in

22   the statute, when it talks about conversion, you're not

23   talking about filing down but it's some other process, right?

24        MR. MULANEY:  Correct.

25        THE COURT:  Okay.  Do you want to articulate what

1   you -- any statutory or case law authority for that reading

2   where it would include switching out the trigger group but

3   not include filing down the --

4           MR. MULANEY:  Yes.  On Page 3 of our sentencing

5   response memorandum, we discuss the *Gravel* case that I

6   mentioned earlier and the definition is -- it's designed to

7   shoot or can be readily restored to shoot automatically.  And

8   in terms of other semi-automatic firearms, they can't be

9   readily restored to shoot because of that process your Honor

10  just described.  But in *Gravel* when the firearm was able to

11  be readily restored to automatic fire, the Second Circuit

12  recognized that that matched the definition of a machine gun

13  in 26 U.S.C. Section 5845(a) and for the purposes of the

14  Sentencing Guidelines.

15          THE COURT:  So filing down wouldn't be readily

16  restoration, if you will?

17          MR. MULANEY:  I believe that's correct, your

18  Honor.

19          THE COURT:  Okay.  All right.  Anything further on

20  behalf of the government?

21          MR. MULANEY:  Nothing further, your Honor.

22          THE COURT:  All right.  And defense?

23          MS. PENABAD:  Thank you, your Honor.  And as your

24  Honor noted at the outset, there is a great deal of overlap

25  here between our objections to the guidelines and the 3553(a)

1    factors.  I think I'll articulate -- I'll do my best to stick

2    to the objections but a lot of what I say will be repeated

3    once we get through the 3553(a).

4         And it is the defendant's position that the

5    appropriate base offense level here is 14 because he was a

6    prohibited person at the time he possessed the firearm and we

7    disagree with the government's position that the base offense

8    level of 20 is appropriate on both of the alternative

9    circumstances.

10        And I think that it's important at the outset to

11   note that the 2K2.1 guideline operates obviously on this

12   graduated scheme where the more dangerous the nature of the

13   firearm, the higher the base offense level.  The more

14   dangerous somebody's criminal history, the higher the base

15   offense level.  And the underlying purpose there, I think, is

16   clear, that the Commission sought to punish more dangerous

17   conduct or people with more dangerous backgrounds more

18   severely with the understanding that those people required

19   additional deterrence or additional incapacitation or more

20   severe punishment.  And the problem here is -- and the logic

21   behind that guideline is that that guideline is not

22   served and the purpose behind that guideline is not served

23   when those purposes of punishment are not served.

24        And so when an individual doesn't have knowledge of

25   the characteristics that render a firearm more dangerous, it

1  doesn't serve the purpose of the guideline or the

2  Commission's intent.  And when a person is handling a firearm

3  that doesn't have the actual capacity that allegedly makes it

4  more dangerous, that doesn't serve the Commission's intent.

5  And I think that that's particularly important here and I

6  think it's important for the Court to take a particularly

7  wiry eye when examining the base offense level because of the

8  unique circumstances here where we have the government

9  playing a role in the commission of the offense and where the

10 conduct of the government, as the agent testified to, will

11 play a role in potential punishment, I think we should look

12 very clearly at whether the base offense level matches the

13 conduct.  And so we believe that the base offense level based

14 on a machine gun is inappropriate for a number of

15 circumstances.

16        The -- Our contention is not that this firearm

17 doesn't meet the statutory definition.  We certainly

18 understand the agent's testimony regarding the frame and

19 receiver.  That's not the contention here.  The contention is

20 whether the base offense level should apply and whether the

21 Commission intended that base offense level to apply and two

22 reasons support a finding that it does -- the Commission

23 does not.

24        The first is that the guidelines and the 2K2.1

25 guidelines specifically focuses on the actual character of

1 the weapon and it does so -- I think we borrow from the

2 Application Notes that talk about the extended magazine.  Now

3 the language in the base offense level says the firearm had

4 a high -- could accommodate a high-capacity magazine, this

5 offense level should be used.  But the Application Notes

6 point out specifically that it's not just the ability to

7 accommodate that magazine, it has to be that the magazine was

8 either attached or in close proximity.  And so I think by

9 analogy, you can see that when the Commission refers to a

10 machine gun, it's not referring to a machine gun that doesn't

11 have the capacity to shoot.  There's no contention here that

12 the weapon that Mr. Travis handled was able to shoot fully

13 automatically.  In fact, the trigger group, as the agent

14 testified, could not have had that selector.  It was

15 physically impossible for the gun to shoot more than one

16 round with one depression of the trigger, which is the

17 definition essentially of a machine gun.  And so I think it's

18 clear that the Commission did not intend for the base offense

19 level for a machine gun to apply in this circumstance.

20         And the same -- we make the same argument with

21 regard to the fact that there was no knowledge here and I

22 think this is particularly an egregious case of no knowledge

23 because not only did Mr. Travis not know that the item

24 internally was by strict definition a machine gun.  The

25 agents didn't know.  The --

1  THE COURT:  Is it your condition -- contention that

2  knowledge is required by law or you're simply arguing the

3  lack of knowledge as a 3553 factor later on?

4  MS. PENABAD:  No, your Honor.  I'm arguing that it's

5  required.

6  THE COURT:  Okay.

7  MS. PENABAD:  And I'm arguing that it's required I

8  think -- and that comes from *Staples,* which is the case that

9  I cited in my memo, which was a somewhat recent Supreme Court

10  case that said that in order for an individual to be

11  convicted of possession of a firearm, that individual had to

12  have knowledge of its character.  And I understand the

13  government's position that, well, *Staples* is about not

14  criminalizing innocent conduct and that's different here but

15  I think that that's taking a shallow look at what *Staples*

16  holds because the reason we don't criminalize innocent

17  conduct is because it serves no purpose.  It serves no

18  deterrent purpose.  It doesn't further -- it doesn't serve

19  the purpose of incapacitating somebody who is dangerous.  It

20  doesn't serve protection of the public purpose.  And that's

21  the same motivation here where we increase a base offense

22  level, it's because of that motivation that there's -- the

23  sentencing purposes would be served.

24  And so particularly here, we're not arguing that

25  Mr. Travis didn't possess a handgun and didn't know that he

1   was going to be involved in a transaction for a handgun.

2   We're focusing on what is the appropriate punishment for that

3   handgun, what is the appropriate base offense level for the

4   handgun and I don't think there is stuff evidence here to

5   enhance the sentence such that the Commission's purpose of

6   serving these sentencing purposes is appropriate.  And so

7   given the lack of the capacity and the lack of knowledge

8   here, I think that that -- a base offense level doesn't

9   apply.

10         And there's a similar argument essentially made

11  about the magazine here and it's the government's burden to

12  demonstrate that the magazine was an extended round magazine.

13  They acknowledge that an MP5 uses a 15- or a 30-round clip.

14  And at the time of the PSR, there was no information that

15  what the number of rounds in the magazine was.  And it's not

16  readily apparent from the video or the pictures taken what

17  the capacity of that magazine is.  The agent --

18         THE COURT:  Are you disputing that the actual

19  magazine that was possessed at the relevant time is a high

20  capacity?

21         MS. PENABAD:  No, your Honor.  We're not -- we're

22  not disputing that it had 30 rounds in it.  The dispute is

23  whether Mr. Travis had knowledge of that -- of the capacity

24  of the magazine.

25         THE COURT:  All right.  So you're conceding that at

1 the relevant time period, the magazine that he possessed was

2 high capacity, it's just you're disputing his knowledge of

3 that nature?

4      MS. PENABAD: Your Honor, we accept the agent's

5 representation that it had -- had 30 rounds; yes.

6      THE COURT: Okay.

7      MS. PENABAD: And I think that -- the question is,

8 is there any evidence that Mr. Travis had knowledge of that

9 extended magazine. There's -- he says on the video that he

10 does not want a 30-round clip. I think your Honor has the

11 video. You can listen. It's our contention that the agent

12 says I don't think this has a 30-round clip. There's no

13 further discussion regarding the capacity of the magazine not

14 at the date that Mr. Travis initially views the firearm or on

15 the date of arrest.

16      And when an individual affirmatively says I don't

17 want a 30-round clip and the government hands them a gun with

18 a high-capacity magazine attached to it, I don't think that

19 that meets the circumstance that the Commission intended

20 either.

21      And I understand that this is a bit of an unusual

22 argument but I think that the reason that we're in this

23 position is because of the nature of what took place here.

24 This is not the type of transaction that would just have

25 happened on the street. Nobody throws in an extra 30-round

1    magazine without telling you what it is or charging you for

2    it if this were to have happened in any other circumstance.

3    I think this is a quirk of the fact that we are in a

4    reverse-sting operation and I don't think the government has

5    proven their burden that the guideline application, the

6    higher base offense level applies here.

7              With regard to the In Furtherance enhancement --

8              THE COURT:  Let me ask one question before you move

9    on to that.  Are you disputing -- and this is just a factual

10   thing.  Are you disputing that factually the MP3 (sic) meets

11   the requirements of 26 U.S.C. 5845(a)?

12             MS. PENABAD:  We are not disputing that the MP5

13   meets the firearm definition.

14             THE COURT:  All right.  So in terms of the

15   enhancement, your legal objection is based on the scienter,

16   the knowledge?

17             MS. PENABAD:  The scienter and the fact that it was

18   not capable of firing automatically at the time, which I

19   believe the Commission and the guidelines call for.

20             THE COURT:  Okay.  So it's -- even though it meets

21   the definition, it wasn't capable at the time and even if it

22   was, he didn't know?

23             MS. PENABAD:  Yes.

24             THE COURT:  Okay.  Go ahead, counsel.  Move on to

25   the "in connection with."

1          MS. PENABAD:  Sure.  The In Furtherance argument is,

2    I think, a pretty nuanced argument and I think that it's --

3    but this is the kind of unusual case that fits within the

4    *Gates* framework and I think again it's important to drill

5    down on these particular enhancements where a government --

6    where the government is essentially pulling some of the

7    strings.

8          I think we're very used to seeing this enhancement

9    applied where there's guns and drugs in the same place

10   because that's the archetypal use of this enhancement where I

11   think the *Doody* and the *Dickerson* opinions referred to the

12   archetypal case being where an individual possesses a gun to

13   protect drugs and the dealer himself and to serve as a

14   warning to those who might attempt to steal the drugs; and

15   that's certainly not the case that we've got here.  There's

16   no allegation that Mr. Travis was attempting to, you know,

17   possess a firearm in furtherance of protecting his stash.

18   Certainly the evidence tendered to date indicates that

19   Mr. Travis never had no access to large amounts of drugs.

20   That's not, I think, the government's contention here.

21         And particularly I think it's interesting that even

22   while Mr. Travis believes that the agents are a biker gang,

23   that he is sort of trying to impress.  When he asked him

24   about the gun, he says I don't really have a need for guns, I

25   just keep it for a rainy day.  So there's no contention here

1  that he's actively using a gun to protect a drug-trafficking

2  career.

3          And I acknowledge that the government cites from

4  *Dickerson* and *Doody* but I note that *Gates* postdates those

5  decisions and what *Gates* does is encourages a sentencing

6  court to reflect specifically on the question of whether the

7  firearm motivated the sale.  So the particular line from

8  *Gates* that we rely on is that there's no evidence that had it

9  not been for the collateral, or the firearm, that the

10 defendant would have canceled the transaction with the buyer.

11 And so it asked the court to focus on would -- had the gun

12 not been there, would the transaction have taken place; and

13 there's an ample amount of evidence in the record that

14 supports the contention that yes, would have taken place

15 without there being a firearm.

16         The agent testified to the multiple different offers

17 that they made to Mr. Travis, that they would exchange drugs

18 for money, that they would exchange drugs for a television,

19 that they would exchange drugs for car parts, for other

20 stolen merchandise.  The question of whether is it the

21 character of the firearm itself that motivated the sale,

22 that's the question that *Gates* encourages the Court to look

23 at and I think has to be answered in the negative here.

24         And for those reasons, we would ask the Court to

25 decline to adopt the 2K2.1(b)(6)(B) enhancement under the

1    special circumstances, the carveout articulated by the

2    Seventh Circuit in *Gates*.

3         THE COURT:  All right.  I think I know the answer to

4    the question but let me spread it of record so we have a

5    clean regard for later.  The Court has articulated

6    specifically what's part of the record for sentencing and

7    this includes but is not limited to the testimony from today,

8    the recording and the report from August 15th, Grand Jury

9    Exhibit 1, 2, 3, 4, the tech report, the arrest report and

10   transcript from the state proceeding which is part of the

11   government's version, the August 27th report, part of the

12   government's version, the government's version itself,

13   sentencing memorandum, plural.  On behalf of the government,

14   the complaint and the affidavit.

15        I understand the legal objections.  Is there any

16   factual objection or dispute as to the facts that are

17   represented in those materials because obviously I'm going to

18   have to find facts before I make any legal determination.  Is

19   there any dispute that those facts as set forth in those

20   materials and the sentencing materials are what they are?

21        MS. PENABAD:  No, your Honor.  I think that there's

22   obviously a bit of a contest over what is the -- what exactly

23   does the agent say.  But beyond that, there's no factual

24   challenge.

25        THE COURT:  Okay.  That's important.  So the only

1  factual dispute I have in front of me that I need to resolve

2  so I can accept all of the facts set forth in those -- I

3  mean, you have no burden but you do have to tell me what

4  you're disputing.  So other than what is said during on that

5  one part on your cross on the August 15th recording, is there

6  any dispute as to the facts?

7          MS. PENABAD:  Your Honor, we're disputing, as your

8  Honor has articulated, the knowledge piece on both of the --

9          THE COURT:  Which is an inference from facts --

10         MS. PENABAD:  Right.

11         THE COURT:  -- right?  So you're saying don't draw

12 that inference, I understand that.  Okay.  What else?

13         MS. PENABAD:  Your Honor, let me take a moment if

14 you don't mind.

15         THE COURT:  Yeah.  Take your time.  Take as long as

16 you need.

17    (Brief pause.)

18         THE COURT:  You know, why don't you confer?  Go

19 ahead.  We'll go off the record for a moment.  Counsel is

20 going to confer.  At this point, the only dispute -- factual

21 dispute is the inference of knowledge based on all of the

22 other facts and what was actually said in the August 15th

23 recording that was published during cross examination.  Other

24 than that, I don't have any factual disputes in front of me.

25 I have a variety of legal disputes but I want to drill down

1   on whether or not there's a dispute on the facts.  Go ahead,

2   counsel.  We'll go off the record.

3       (Discussion off the record.)

4           THE COURT:  Okay.  We're back on the record.  Go

5   ahead, counsel.

6           MS. PENABAD:  There's no further factual disputes.

7   Thank you, your Honor.

8           THE COURT:  Okay.  Do you need to respond to

9   anything, counsel, on behalf of the government?

10          MR. MULANEY:  Very briefly, your Honor.

11          THE COURT:  Yeah, sure.  Go ahead.

12          MR. MULANEY:  Well, with regard to the capacity of

13  the magazine, the Seventh Circuit case that the government

14  referred to earlier is *United States versus Cherry* that was

15  decided after the Supreme Court's decision in *Staples* which

16  dealt with a different type of charge, for possession of a

17  machine gun, and the *Cherry* case is very explicit for the

18  purpose of this Sentencing Guideline that the plain language

19  of that guideline, that the offense involved a semi-automatic

20  firearm that is capable of accepting a large-capacity

21  magazine suggests no knowledge requirement.  And the Seventh

22  Circuit held in that case that because defendant knowingly

23  possessed the semi-automatic firearm with a large-capacity

24  magazine at issue in that case during the commission of the

25  offense and -- because no knowledge that the firearm had the

1   capability of accepting a large-capacity magazine is

2   required, that that enhancement is proper to apply.  So it's

3   the government's position that that is determinative of the

4   base level offense of 20 and the Court can essentially stop

5   there with regard to that objection.

6          With regard to defendant's actual knowledge, I think

7   it's worth pointing out as indicated in the exhibits we

8   tendered showing the firearms in relation to each other, the

9   pictures from the video that we'll -- we will submit that --

10  showing the defendant handling the magazine itself that the

11  defendant was aware of the 30-round capacity.  Defendant is

12  familiar with firearms as shown by his criminal history in

13  his discussion of the firearms with the agents and, you know,

14  he was offered a 30-round capacity for the handguns as shown

15  on the recording and that's when he makes that statement

16  about, you know, you can get off 30 round -- if you shoot 30

17  rounds before the police get there, you got bad aim.

18         Again, the Court does not need to make this

19  determination.  The defendant had actual knowledge but I

20  think it's abundantly clear he did and that the agent's

21  statement I don't think after that -- after Mr. Travis'

22  comment was in reference to the handgun discussion and then

23  the undercover transition to what the MP5 has a 30-round

24  magazine and Mr. Travis acknowledges that it does.

25         Also on the enhancement, the -- for exchanging --

1  for possession of the gun in connection with gun trafficking,

2  the *Schmitt* case says that that specific trade is enough to

3  satisfy the enhancement but the Court can also consider the

4  possession of the firearm in connection with defendant's

5  general drug-dealing activities and it's documented in the

6  record that the defendant was selling heroin and cocaine not

7  only to the undercover officers but he was found in

8  possession of what appeared to be cocaine on August 9th --

9  I'm sorry, August 7th shortly before his arrest in this case.

10  And when he said he wanted the MP5 for his personal use, that

11  was likely an indication that he wanted it in connection with

12  his drug activities.  But the government's position is the

13  *Schmitt* case is very clear that the trade for drugs for guns

14  alone is sufficient and the defendant was given the option of

15  paying cash and he chose -- he opted to pay with drugs.

16          THE COURT:  Thank you, counsel.  Anything further?

17          MS. PENABAD:  Your Honor, just briefly.  We dispute

18  the government's contention that Mr. Travis possessed any

19  firearm in order to protect drug-trafficking activities.  I

20  think there's no record that at any point in any of the

21  transactions that he possessed a weapon, that there was a

22  weapon in the home, anything along those lines.  There's

23  simply not any evidence of possession other than this

24  interaction, this reverse-sting interaction with ATF agents.

25          Certainly we acknowledge that there are prior

1    incidents where Mr. Travis was pulled over with other

2    individuals.  There was a gun in the car.  Mr. Travis does

3    have that old UUW but there's been nothing since that

4    conviction to indicate that he possessed any firearm in

5    connection with his drug-trafficking activities.

6              THE COURT:  Okay.  The Court is going to take the

7    objections to the enhancement under advisement.  The

8    government is going to submit the recording of that August

9    15th report by close of business today if you can.

10             Gloria, can you give me a date for conclusion of

11   sentencing about 45 days out, plus or minus?  Are the parties

12   going to order the transcript?

13             MS. PENABAD:  Your Honor, I think --

14             THE COURT:  It's probably going to be ordered anyway

15   at the end of the day anyway so we might as well get it done.

16             MS. PENABAD:  I think that --

17             THE COURT  I just want to make sure we have enough

18   time to have that done on a non-expedited basis because

19   there's no reason for the expense otherwise because we're

20   going to have -- it's going to take some time for me to get

21   through this as well.

22             COURTROOM DEPUTY:  April 28th at 1:00 p.m.

23             THE COURT:  Is that good for the parties?

24             MS. PENABAD:  Excuse me.  I'm available on the 28th,

25   yes.  Thank you.

1          THE COURT:  Is that good for the government?

2          MR. MULANEY:  That works for the government.

3          THE COURT:  All right.  Go ahead and order the

4    transcript and then I will review that and the materials for

5    sentencing and the arguments of the parties.

6          On our next court date, we'll go through the

7    guideline calculation, the objections to the supervised

8    release terms.  There was three objections noted by the

9    defense.  Go ahead and take a look at those.  We'll address

10   all of the guideline issues and then 3553 factors and

11   completion of sentencing.  Anything else we need to address

12   today?

13         MR. MULANEY:  Your Honor, I think we mentioned

14   earlier that we were going to submit the -- a video of August

15   27th that was clipped in our sentencing memorandum showing

16   the defendant handling the MP5 so I want to make sure that's

17   part of the record that we would -- we will plan to submit

18   that by close of business along with the August 15th

19   report.

20         THE COURT:  All right.  Any objection to that?  So

21   the factual record would include the recording of August 15th

22   and August 27th; is that right?

23         MS. PENABAD:  That's my understanding.

24         MR. MULANEY:  That's correct.

25         THE COURT:  Okay.  Any objection to that, counsel?

1       MS. PENABAD:  No.

2       THE COURT:  Any factual objection to the materials

3  in that August 27th?

4       MS. PENABAD:  No.

5       THE COURT:  Okay.  All right.  So go ahead and

6  submit both of those.  Those will be part of the record for

7  sentencing.  Anything else on behalf of the government?

8       MR. MULANEY:  No, your Honor.

9       THE COURT:  Anything else?

10       MS. PENABAD:  Not at this time.

11       THE COURT:  All right.  Thank you, counsel.  I'll

12  see you on the next court date.  Court's in recess.

13     (Which concluded the proceedings in the above-entitled

14  matter.)

15                 C E R T I F I C A T E

16       I hereby certify that the foregoing is a transcript

17  of proceedings before the Honorable John Robert Blakey on

18  March 3, 2020.

19

20  /s/Laura LaCien
                                    April 6, 2020
21  _____                Date
    Laura LaCien
    Official Court Reporter
22

23

24

25